1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  DARLENE RENEE FOUSE,                    )   1:09-CV-01382 LJO JMD HC
                                          )
10                    Petitioner,         )   FINDINGS AND RECOMMENDATIONS
                                          )   REGARDING PETITION FOR WRIT OF
11      v.                                )   HABEAS CORPUS
                                          )
12  TINA HORNBEAK,                        )
                                          )
13                    Respondent.         )   THIRTY (30) DAY DEADLINE TO FILE
                                          )   OBJECTIONS
14

15          Darlene Renee Fouse  (hereinafter "Petitioner") is a state prisoner proceeding *pro se* with a

16  petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

17                                  **PROCEDURAL HISTORY**

18          Petitioner is currently in the custody of the California Department of Corrections and

19  Rehabilitation pursuant to a May 9, 2006, jury verdict finding Petitioner guilty of two counts of

20  attempted murder of a peace officer (Cal. Penal Code §§ 187, 664(e)), three counts of robbery of an

21  inhabited dwelling (Cal. Penal Code §§ 211, 212.5(a), 213), one count of assault by means of force

22  likely to produce great bodily injury (Cal. Penal Code § 245(a)91)), and one count of conspiracy to

23  commit residential robbery (Cal. Penal Code §§ 182, 212.5(a)).[1]  The trial court imposed a

24  determinate term of eleven years and an indeterminate sentence of two life terms with the possibility

25  of parole.

26  ───────────────

27      [1] Petitioner was tried jointly with Anthony Lawrence Martinez ("Martinez"), David Wayne Morrison ("Morrison"),
    and David Anthony Silva ("Silva").  A fourth defendant, David Michael Silva, had also been charged in the indictment but
28  plead out prior to trial.

1    Petitioner appealed her conviction to the California Court of Appeal, Fifth Appellate

2    District.[2]  The California Court of Appeal issued a reasoned opinion on March 13, 2009, staying

3    Petitioner's sentence for assault but affirming the judgement.  (*See* Lod. Doc. 4.)  Petitioner filed a

4    petition for review with the California Supreme Court, which the state high court denied on June 24,

5    2009.

6        On August 7, 2009, Petitioner filed the instant federal petition for writ of habeas corpus.

7        On November 9, 2009, Respondent filed an answer to the petition.

8                                    **FACTUAL BACKGROUND**[3]

9                                    *Count 1-May 25, 2003*

10       Shortly after midnight on May 25, 2003, three intruders broke into the home
     of Keyes resident Jimmy Lasater. He could see two of them; they were males and
11    wore ski masks, dark jackets, and what appeared to be leather gloves. Each had a gun.
     They covered Lasater's face with his pajama bottoms and tied his hands behind his
12    back with a rope that had been in one of the bedrooms. They then began ransacking
     the house. Lasater estimated they were there for an hour and a half to two hours. They
13    stole money and a number of guns, one of which, a Browning nine-millimeter
     semiautomatic, was recovered by authorities following the arrests in this case.

14
                                   *Counts 2-4-June 26, 2003*
15
         At approximately 12:30 a.m. on June 26, 2003, multiple intruders broke into
16    the Turlock home of P.S., his wife, Jane Doe One, and their children. Jane Doe One
     believed there were four to five people, all with guns; P.S. believed he saw two
17    people with guns, although he heard footsteps elsewhere in the house. All were
     dressed in ski masks, dark clothing and gloves. Two people-both males-bound the
18    couple's hands and ankles with electrical cords cut from items in the bedroom. Jane
     Doe One's head was covered with a towel, while a blanket was thrown over P.S.'s
19    upper body.
         The intruders ransacked the house and terrorized the couple while demanding
20    the receipts from their businesses and the locations of their valuables. One of the
     intruders pressed a sharp object against P.S.'s left eye area while questioning him.
21    Someone subsequently grabbed P.S.'s penis, held a sharp object against it, and
     threatened to cut it off. One of the intruders then sexually assaulted Jane Doe One by
22    penetrating her vagina with his finger.
         All told, the intruders were in the home approximately an hour to an hour and
23    a half. Among the items they took were jewelry, identification and credit cards, a

24    _____

25    [2]The Court notes that Respondent incorrectly asserts that Petitioner appealed her conviction the Third Appellate
     District.  Additionally, Respondent's mistakenly labels the Petitioner's opening brief on appeal (Lod. Doc. 3) as the reply
26    brief.  Similarly, the actual reply brief (Lod. Doc. 1) is labeled as the opening brief .

27    [3]These facts are derived from the California Court of Appeal's opinion issued on March 13, 2009.  (*See* Lod. Doc.
     4.)  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is
28    presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1);
     *see Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *Moses v. Payne*, 555 F.3d 742, 746 n. 1 (9th Cir. 2009).

digital camcorder, cash, and one of the couple's cars. They cut the home telephone line and took the couple's cell phones. Authorities found footprints in the orchard across the street from the residence, and tire marks going eastbound. The couple's vehicle was found later that morning about a quarter to a half mile east of the residence. The camcorder was recovered from Silva's residence after the arrests in this case, and he was shown on the videotape it contained.

*Counts 5-9-July 15, 2003*

At approximately 4:30 a.m. on July 15, 2003, four intruders, two of whom had guns, broke into the Modesto home where Ramon Mechuca, Jose Hernandez, and Francisco Hernandez resided. The men, whose faces were covered with dark handkerchiefs, bound the wrists of Mechuca and Francisco Hernandez with black plastic ties and pulled a blanket over their heads.

One of the intruders, who spoke broken Spanish to Mechuca and the Hernandezes, demanded to know where the money and drugs were. When Mechuca said they had no drugs, the intruder threatened them and said some things in English to another person. The intruders took Mechuca's money and ring, and broke the men's cell phone. They also beat Francisco Hernandez, causing the blanket to come off of Mechuca's head and allowing him to see Morrison's now-uncovered face. Morrison said, " 'He saw my face,' " and " 'Let's kill him.' " Mechuca was then beaten until he pretended to be unconscious. Francisco Hernandez was beaten with a frying pan. The intruders overturned the couch onto Mechuca's and Francisco Hernandez's backs and jumped up and down on it while laughing. They then badly beat Jose Hernandez. All told, they remained in the house for about an hour to an hour and 45 minutes.

*Counts 10-11-July 21, 2003*

At 8:00 a.m. on July 21, 2003, Christine Baker and her husband, Richard, entered their residence in Delhi, after working in the walnut orchard surrounding the house, to discover two men, dressed all in black and wearing ski masks, and each with a gun. Kitchen aprons were put over the Bakers' heads, and their wrists and ankles were bound with black plastic straps. The men demanded the location of the Bakers' money, safe, and other valuables.

Ultimately, the intruders ransacked the house, cut the telephone lines, and took cash, jewelry, and the Bakers' vehicle. They remained in the house for 45 minutes to an hour after the Bakers returned from the orchard. The Bakers' car was recovered later that day from an orchard about three miles from the house. Tracks from another vehicle were close by. Authorities recovered some of the couple's belongings following the arrests in this case.

*Counts 12-14-July 24, 2003*

A little before 2:00 a.m. on July 24, 2003, three men claiming to be the police broke into the Turlock residence of Cynthia and William Gibbs and their children. At least two of the intruders had guns, and one was wearing black clothing and a ski mask. The couple's hands and ankles were bound with black zip ties and their heads were covered. When Ms. Gibbs called to her children to call 911, she was punched in the face. The children were then similarly bound and covered.

The Gibbses ran a business from an office on their property, and the intruders wanted to know where Gibbs kept the money he paid his employees. They took him out to the office and had him open the safe, then returned him to the house.

The intruders remained in the home at least two to two and a half hours. Before they left, they gagged the family with socks and duct tape. They also disabled the telephones. They ransacked the place and took jewelry, a gun, other items, and the

family's car. It was recovered later that day a short distance away. From shoe patterns in the dirt, it appeared three people had run from the car to where another vehicle had parked nearby. Boots subsequently seized from Silva could not be excluded as the source of some of the impressions, and most likely were the source of one of the impressions. Authorities recovered some of the family's belongings following the arrests in this case.

*Count 15-August 4, 2003*

In August 2003, F.G. resided in Merced with her husband, Z.M., and son. She had a small business selling jewelry to people in their homes. She kept the jewelry in a safe in her kitchen. In late July, Morrison had twice come to the house to ask about a car F.G. had for sale.

Around 3:30 a.m. on August 4, two men with guns entered the house. Both wore black clothing and ski masks. One intruder, who spoke in English, threatened to kill everyone in the house if the police came. The intruders bound F.G., Z.M., and visiting family members with black plastic bands. Z.M.'s head was covered. One of the intruders pressed a knife blade to the back of Z.M.'s neck and demanded money. When Z.M. responded that they had no money in the house because they had been burglarized three months earlier, the intruder began cutting Z.M.'s neck and threatened to kill him.

At some point, a third intruder with a gun entered the house. F.G. heard one of the intruders talking on what she believed was a cell phone. The man asked, in broken Spanish, which one was the woman who was going to open the safe. F.G. recognized the voice that replied on the cell phone and described her as being that of a former boyfriend who knew where she lived and about her jewelry business. A short time later, she was taken to the kitchen and struck in the face, whereupon she opened the safe. Her face was then covered with a towel. After the intruders went through the safe, F.G. ended up in the living room, where her breasts and vagina were touched over her clothing. Someone tried to rip off her shorts, but desisted when she struggled and yelled.

The intruders were in the house for about 30 minutes. They ransacked it, cut the telephone lines, and took everything of value, including the jewelry F.G. had had in the safe, which was worth $80,000 to $100,000. Authorities recovered some of the jewelry following the arrests in this case. Also recovered was some of the jewelry that had been taken in the earlier burglary.

*Counts 16-17-August 7, 2003*

Around 12:45 a.m. on August 7, 2003, three men, wearing ski masks and dark clothing and with guns drawn, entered the Turlock residence of Renae Frye and William Cozine. The intruders tied the couple's wrists and ankles with large black zip ties, and covered their heads. They pepper-sprayed Frye's small dog when it became aggressive, and demanded to know where the drugs were. When the couple told the intruders they were at the wrong house, the men started asking for "big money." They had Frye open the safe.

The intruders were in the house for about 45 minutes to an hour, during which time they ransacked the premises and cut the main telephone line. They took jewelry, cash, and the couple's cell phones. Authorities recovered the cell phones following the arrests in this case.

*Counts 18-20-August 11, 2003*

At around 3:00 a.m. on August 11, 2003, at least three men broke into the Delhi home of Vicki and Kenneth Myers. At least two had guns; all were wearing dark clothing and had their heads covered. When one of Ms. Myers's small dogs

became aggressive, the intruders sprayed something at it and it fled. The intruders then covered the couple's heads and bound their wrists and ankles with black zip ties. Myers was struck in the back of the head a couple of times with what felt like a fist.

The intruders demanded the locations of jewelry, money, and valuables. They also wanted information about the Myerses' businesses, and threatened to hurt the couple's daughter, who lived at the ministorage facility. They appeared to know this and also that the receipts for the ministorage were deposited on Mondays. At one point, one of the intruders accidentally cut Ms. Myers's finger to the bone when repositioning her hands. One of the intruders uncovered all but her head, then jerked her panties as if he was going to pull them down. He stopped, however, and just covered her back up. When the men found the safe, they put Myers on his knees, put a gun to the back of his head, and clicked the gun twice. When he told his wife that they were going to kill him and that he loved her, she begged them not to do it. They then forced Myers to open the safe, after which one of them kicked him in the back a few times with what felt like a boot.

The intruders remained in the house for approximately 45 minutes. They cut the telephone lines to the house, and took jewelry, money, a rifle and a side-by-side Browning 12-gauge shotgun, and a cell phone. It was subsequently discovered that someone apparently had parked in the orchard beyond the fence near the southwest corner of the property. There were a number of shoe prints in the area. Very shortly after the incident ended, Myers saw a car driving across the back of the property on the frontage road. Because it was still dark out, he could not ascertain its color or identify it in any way.

The following day, Ms. Myers saw a newspaper article about another home invasion. Anyone with information was asked to call Detective Campbell of the Stanislaus County Sheriff's Department. Ms. Myers called the number given to inform Campbell that such things were also occurring in Merced County. Authorities recovered some of the Myerses' belongings following the arrests in this case.

*Counts 21-23-August 11, 2003*

At approximately 4:30 a.m. on August 11, 2003, Steve Christy, who resided in Hughson, was awakened by what sounded like an explosion and the alarm going off. He saw three people with guns entering the house. All wore dark clothes and masks, and they told him to turn off the alarm. Once he complied, they restrained his wrists with a plastic zip tie and covered his head.

One of the intruders asked where the money was, and then for the safe. When Christy insisted he did not have one, a foot or hand was placed on the back of his neck, something was pointed at the back of his head, and the intruder again asked where the safe was and threatened to kill Christy. Christy heard a click from the gun behind his head, then the intruders took him out to his shop, which was about 100 feet from the main house. Once there, the one intruder again asked the location of the safe. Someone started looking through the shop, while another intruder struck Christy near his right kidney with what felt like a fist, knocking him unconscious. When he regained his senses, one of the intruders helped him back into the house.

All told, the intruders were at the house around an hour to an hour and a half. They ransacked the premises, cut the telephone line to the house, and took jewelry belonging to Christy's late wife, cash, a Browning 12-gauge shotgun, a .38-caliber revolver, and some other items. Authorities recovered the shotgun and some of the other items following the arrests in this case.

*Counts 24-29-August 12-13, 2003*

At approximately 3:30 a.m. on August 12 or 13, 2003, three men, all wearing black clothes and masks, entered the Ceres residence of Jane Doe Two, her husband

M.J., and their two adult children, T. and M.[4]M. was in the family room, awake, when one of the intruders struck him in the head with something hard. Meanwhile, another intruder, who had a gun, awakened Jane Doe Two and M.J., struck M.J. in the head with the gun, covered the couple's heads, and took them into the room where M. was. A third intruder with a gun brought T. into the room. The children's heads were also covered. Everyone's wrists and ankles were bound with cords from telephones or electric appliances.

The intruders demanded to know the location of money, jewelry, and guns. One of them held a gun to M.J.'s head and threatened to kill him if he did not tell them where everything was. M.J. heard the gun click several times while it was held to the back of his head. M.J. took them to the bedroom and showed them where the jewelry and guns were. After he was returned to the other room, he was kicked in the head several times.

One intruder then took Jane Doe Two to open the safe, which was in the weight room. He then took her out to the office, where a money box was kept. At some point, another intruder joined them. Jane Doe Two opened the money box, whereupon one of the intruders cut off the underwear and bra in which she had been sleeping. The intruders then returned her to the living room, where one fondled her. One of the intruders then stuck the gun in her vagina and told her husband he would " 'blow her up' " if M.J. did not tell him where the money was. When Jane Doe Two screamed, the intruder removed the gun from her vagina and put it toward her posterior, although the gun did not actually penetrate her anus.

The intruder then carried Jane Doe Two outside to the deck, where there was a hot tub. He wanted to know where the money was and stuck her head underwater in the hot tub several times. M.J. was also brought outside. The intruders demanded to know where more money was at, but there was no more money. M.J.'s head was dunked underwater, then the couple was returned to the house. There, Jane Doe Two was fondled and her vagina was penetrated with a dildo.

The intruders were in the house some 45 minutes to an hour, during which time they ransacked the family's belongings. They disabled the telephones and took jewelry, cash, guns, and a knife. Authorities recovered some of their belongings following the arrests in this case.

*Counts 30-31-August 15, 2003*

At approximately 1:20 a.m. on August 15, 2003, Marcos Renteria was asleep in his Ceres residence when he was awakened by a loud noise coming from the attached garage. Renteria arose and managed to partially dial 911 on his cell phone, but before he could complete the call, someone kicked down the door to his bedroom. Renteria saw two men, both with guns drawn on him. The intruders were wearing dark clothing and had handkerchiefs covering the lower halves of their faces.

When the intruders entered, they turned on the bedroom light and started yelling at Renteria to get down. One grabbed the phone and threw it on the ground. When Renteria said they could have anything, one of them said, " 'Anything?' " They then began to beat him and a burning liquid was sprayed at his face. One of them put a gun to his head, and Renteria tried to grab it. At some point, one intruder's mask came off or Renteria pulled it off. It was Martinez. The other intruder said, " 'Shoot him, Bro.' "

Renteria fled to the garage. He managed to raise the door a bit, but the

---

[4]Jane Does One and Two were given those appellations because they requested nondisclosure of their names pursuant to section 293. At the sentencing hearing of the male defendants, the trial court was informed that Jane Doe Two henceforth wished to be known by her true name. Given this court's policy of protective nondisclosure and the fact she is referred to as "Jane Doe Two" throughout the trial, we continue to use that designation for her.

intruders caught him and started punching him again. Renteria managed to dive underneath the garage door. Once outside, he started to run. He was shot four times. His injuries required prompt medical attention and surgical repair to prevent loss of limb or death. His DNA was subsequently found on Silva's boots. To Renteria's knowledge, nothing was taken from the house.

*Counts 32-35-September 10, 2003*

In September 2003, Homer Garza, Sr., resided in Denair with his wife Virginia, 14-year-old daughter Melissa, and 23-year-old son Homero, Jr.[5] Garza, a farm manager, had an office at his residence, as well as one at his work site. An alarm system that was connected to a security company and the sheriff's department had been installed at the house on September 9.

At approximately 2:20 a.m. on September 10, Garza got up to see his wife off to work and to check on some water he had running in his orchard. Everything seemed fine. Around 3:30 a.m., he was asleep when the alarm went off. Thinking there was a problem with the installation, he was hurrying to turn off the alarm, the control panel for which was by the front door, when three intruders entered the house by breaking open the dead-bolted front door. One held a shotgun to Garza's head and said that if he did not quickly turn off the alarm, the intruder would " 'blow [his] brains out.' " The intruder repeated this and banged Garza's head with the butt of the shotgun multiple times. Garza was able to tell the intruders were wearing masks. He heard three male voices.

Garza managed to turn off the alarm. The intruders took him into the living room, where he was placed face down on the floor, his hands and ankles were restrained with black plastic ties, and his head was covered. As one of the intruders ran down the hallway toward the children's rooms, another put his foot to Garza's neck, applied pressure, and asked him where the money was. The shoe felt heavy. The intruder told Garza that his son was covered in blood, and that if he loved his son, he would tell the intruder where the money was. Garza told him that there was money in his wallet in the laundry room. The intruder then asked where the "clavo" was. In the Spanish culture, "clavo" is a slang term that means "stash." [6] Garza understood it to mean money or jewelry, and he told the intruder that he did not know what he was talking about. The intruder then got angry and kicked Garza in the side of the face.

Meanwhile, Homero was awakened when his locked bedroom door was kicked in. What appeared to be a shotgun and a flashlight were pointed at him. He could hear the alarm in the background. It went off after 15 to 25 seconds. Homero was told to lie face down on his stomach, and his wrists and ankles were restrained with black zip ties and a blanket was thrown over him. Homero could hear three male voices. The intruders spoke in English, except that Homero, who understood Spanish, heard the term "ese" four or five times when one intruder addressed another. The two intruders in his room used the term and seemed to have Hispanic accents.

Homero heard one of the intruders tell his sister to get up and then to get on the ground. He then heard what sounded like someone being struck. Although he did not hear his sister make any sound, he yelled out not to hurt her, that she was only 14. The intruders repeatedly asked Homero where the money was; when he insisted there was no cash in the house, he was kicked a few times in the back of his head with something that felt sturdy, like a boot. At some point, Homero could hear his father

---

[5]For the sake of clarity, we will refer to the Garza children as Melissa and Homero. No disrespect is intended.

[6]Although English was Garza's native language, he was fluent in Spanish. Except for the word "clavo," the intruders spoke English to him and, as far as he heard, to each other.

insisting that there was no money. When the intruders were asking Homero where the money was, they said that if he was lying, his father was going to get hurt worse, and that Homero should look at him, that he was bleeding all over. Homero knew they were lying, because he could hear his father and had not heard him being struck or asking not to be hit.

Eventually, one of the intruders asked Garza how to turn off the front lights. Garza told him the location of the switch, then heard a car nearby that sounded like its muffler was torn up. The car was leaving. The house was quiet then. Homero, who had been left alone in his room after it was searched and items were taken, managed to free himself and then his father and sister.[7] They discovered the telephones were missing from the wall and their cell phones were in the toilet, so Homero activated the panic button on the alarm to summon help.

The incident lasted 40 to 50 minutes, during which the house was ransacked. The intruders took a number of items, including jewelry, money, and a video camera. Authorities recovered some of the items following the arrests in this case. Garza suffered cuts and bruises to his head and face from being kicked and struck with the gun butt. He also had bloody marks on his ankles from having his feet tightly bound. Melissa sustained a facial abrasion and marks on her wrists and ankles. Homero had marks on his wrists and ankles that were visible for about a month. None of the family sought medical attention.

Shoe prints were found between the residence and the road. Boots subsequently seized from Silva could not be excluded as the source of some of the impressions. Boots subsequently seized from Martinez could not be excluded as the source of other of the impressions. There were tire tracks in the orchard near the house that appeared to go from the road, into the orchard, and then out onto the road again. The shoe prints led toward the area where the tire prints were found.

*Counts 36-37-September 10, 2003*

Early on the morning of September 10, 2003, Stanislaus County Sheriff's Detective Nuno was assigned to be part of the arrest team, if residential robbery suspects, who were under surveillance, committed a robbery. Sergeant Allen, who was the team supervisor, was with Nuno in one vehicle, while the rest of the SWAT team and a couple of other detectives were in other vehicles. Nuno and Allen were in an unmarked car that was equipped with lights and a siren. Nuno was driving.

At approximately 4:30 a.m., Nuno and Allen were at the staging area in Hughson, when they received information that the individuals were believed to have committed a residential robbery in the area. The surveillance team reported the suspects' location; Nuno had previously been informed that the suspect vehicle was brownish or golden and had the words "Cold Pimp'n" on the back.

Nuno and Allen, who were in the lead vehicle, and the rest of the arrest team moved to intercept the suspects. Once the team was in position, Nuno activated his lights and siren. The suspect vehicle slowed down as if it was going to stop, but then accelerated. A pursuit ensued that covered seven to 10 miles and lasted approximately 10 minutes.

Nuno followed the vehicle from a rural area into a residential neighborhood in Turlock. There, the car slowed down and began making turns. The rear doors opened a couple of times, then, in the vicinity of 550 Angelus, near the intersection of Angelus and Spruce, the vehicle slowed almost to a stop. Nuno slowed down as well, and pulled toward the driver's side passenger area of the vehicle. The right rear door opened completely, and Martinez got out. He was wearing black clothing, a black beanie-type hat, black boots, and a bandolier, and had a shotgun in his hand. As he

---

[7]Melissa was on the floor. Her wrists and ankles were restrained with black zip ties. A blanket was covering her head.

turned toward Nuno and Allen, the shotgun also turned in their direction. Allen opened his door, stepped half out of the car, which was still moving, and fired several shots at him. Because Allen was behind the door of the car and the window was not rolled down, he fired through the window, which shattered. The shots also damaged the vehicle's outside mirror. The Cold Pimp'n vehicle was about 10 to 15 feet in front and to the right of his and Nuno's position at that point. As Martinez ran toward a residence on the south side of Angelus, Allen reacquired the target, stood up, and fired again. He was standing behind the door of his and Nuno's car, which was now slightly rolling away from him.

Immediately after Allen fired the second time, he and Nuno heard loud booms, which Allen believed to be gunfire. They were coming from the suspect vehicle, toward Allen. Allen had stepped out of the car in which he had been riding, and was standing right next to it. He was still somewhat in the doorway, with the car moving away from him. When he first heard the gunshots, Nuno's car had not completely cleared his position. The suspect vehicle was still in front of Nuno's car, approximately four to five car lengths away. The lower driver's side portion of Nuno's windshield broke, and he realized he was being shot at. Glass from the windshield cut his left cheek, and the bullet, which struck the driver's side door frame, was probably inches from his face. Nuno heard several booms. Allen heard two or three shots. Nuno was not sure which shot hit the windshield, but it was neither the first nor the last.

As this was going on, the suspect vehicle started to move. Nuno accelerated to catch up to it, and Allen followed Martinez.[8] At the intersection of Angelus and Spruce, approximately 100 yards from where Martinez had exited the vehicle, the two passenger side doors opened. As the car was either completely stopped or moving slowly, Morrison got out of the rear passenger side. Nuno did not see anything in his hands. Silva got out of the front passenger side. He was dressed in dark clothing and holding a chrome-colored handgun.

Because Silva was holding a firearm, Nuno positioned his car at an angle and began to shoot at him through the broken-out passenger window. He could not tell whether any of his shots struck Silva, who disappeared into the darkness, as did Morrison. Having lost sight of them, Nuno came around the driver's side of the suspect vehicle, at which point he saw the driver exit. It was Fouse. Nuno gave chase as she ran into a yard across the street, then took her into custody without further resistance.

Fouse was taken into custody around 4:45 a.m. A subsequent search of the vehicle revealed a number of items that the Garzas later identified as belonging to them, as well as a black baseball cap and black ski mask. The ski mask had two eyeholes, and a mouth opening that had been closed by some means. A camouflage hood was found on the rear floorboard. A shotgun was found in the front yard of the residence at 550 Angelus, where Martinez had jumped the fence into the backyard and fled from Allen. In the backyard was a bandolier with shotgun shells in it.

Ward assisted in taking Silva into custody about 5:30 or 6:00 a.m. Silva was hiding in the carport of the residence at 733 South Orange Street. When apprehended, he had a cell phone in his hand. Eight black plastic zip ties, each individually secured in a loop, were found underneath the vehicle where Silva had been hiding. Although Silva only had a pocketknife on his person, two black nine-millimeter magazines for a semiautomatic weapon were found in the backyard of the residence, about 15 to 20 feet from the carport. One contained 10 rounds and the other contained nine. A black

---

[8]Stanislaus County Sheriff's Deputy Ward, who was also a member of the arrest team, was running toward the area to assist. Ward estimated that seven to 10 shots were fired from the area of the suspect vehicle. At the time Ward heard them, Nuno had already dropped Allen off and driven after the other vehicle. Allen was running after the suspect who had left the vehicle.

Browning High-Power semiautomatic handgun with a magazine in it was subsequently located in the backyard of the neighboring residence at 720 Spruce. The two backyards were separated by a fence with a gap in it, and the two magazines were some six to 10 feet from the black handgun.

Although the black handgun was photographed where found and Deputy Luck, then a Stanislaus County Sheriff's Department trainee, was assigned to watch the evidence in the area, the gun was no longer there a couple of hours later when sheriff's personnel returned to collect it, and Luck was no longer in the immediate area. A resident of the house agreed to assist Deputy Reed, Luck's field training officer, in trying to recover the handgun. The following day, this person directed Reed to an apartment complex in Turlock and retrieved what appeared to be the gun. A check of the weapon's serial number revealed it had been taken in the Lasater robbery. Subsequent comparison revealed that one of the unfired cartridges in the magazines found in the backyard at 733 South Orange most likely was cycled through this gun.

A silver-colored Smith and Wesson .357-caliber revolver was found in an adjacent backyard at 717 South Orange.[9] The revolver, which was capable of holding six rounds, contained six empty shell casings.

Nuno assisted in capturing David Michael Silva, who was hiding in a duplex laundry room on Spruce, near Angelus. David Michael Silva was taken into custody between 6:00 and 7:00 a.m.

Just before 8:00 a.m., Stanislaus County Sheriff's Detective Cook found Martinez hiding in the backyard of the residence at 364 South Avenue, at the corner of South Avenue and South Orange Street. A black zip tie and a loaded Mossberg 12-gauge shotgun (also known as a Moss) were recovered from the area in front of the residence at 550 Angelus.[10] A black strap containing 12-gauge shotgun rounds was found in the backyard of the residence.

Around 1:30 p.m., Morrison was taken into custody inside the residence at 653 South Avenue.

*Additional Evidence*[11]

Detective Campbell, who became the lead investigator on the day of the Gibbs case, began to focus on Morrison, Silva, and Martinez as potential suspects shortly after the robbery of M.J. and Jane Doe Two. On about August 13, members of the Stanislaus County narcotics task forces were asked by the Stanislaus County Sheriff's Department to assist in surveillance of the suspects.[12]

Richard Balentine, an investigator for the Stanislaus County District Attorney's Office, was part of the surveillance team for approximately 22 out of the 27 days the surveillance lasted, and also spent three days monitoring intercepted conversations in the so-called wire room. Martinez, Silva, and Morrison were three of the individuals targeted for surveillance, and were seen together on a number of occasions. During the surveillance period, certain homes and vehicles came to be

---

[9]The three parcels were contiguous; 720 Spruce and 733 South Orange were back to back, and 717 South Orange ran along both of them. The break was in the fence between 720 Spruce and 733 South Orange.

[10]The shotgun later was identified as belonging to M.J. and Jane Doe Two.

[11]We do not separately set out evidence presented with respect to count 38, the conspiracy charge, as much of it comprises the evidence presented with respect to one or more of the incident-specific counts.

[12]There were three such task forces, which combined resources and personnel. The local task force was Stanislaus County Drug Enforcement Agency (SDEA); the state task force was California Methamphetamine Enforcement (CalMMET); and the federal task force was High Intensity Drug Trafficking Area (HIDTA).

recognized as being associated with them. Silva was associated with two residences, one at 20077 First Street, Hilmar, and the other at 3512 Woodglen Court, Modesto. He was seen driving a 1984 Buick Park Avenue, variously described as silver or brown, with large white letters spelling "Cold Pimp'n" in the back window. He was also seen driving a white 1999 Mitsubishi Eclipse convertible. On a few occasions, Virginia Ellsworth was seen in Silva's company, and also in his vehicle at his residence. Martinez was seen coming from, going to, and staying the night at 733 South Orange in Turlock, and he was occasionally seen on Davis Court in Delhi, the same address on Woodglen in Modesto as Silva, and, near the end of the investigation, on South Carpenter Road. Martinez was associated with a green 1997 Dodge pickup. Morrison was seen going to, coming from, and staying the night at 16347 Davis Court, Delhi, the same address at which Martinez occasionally was seen. Morrison was associated with a gold Chrysler Intrepid. Morrison was often seen associating with Patricia Ramos.

Fouse was also under surveillance. Balentine twice saw her at the Woodglen address. On one of those occasions, August 30, she drove up and walked into the house, then came back outside with Silva and two other males. All four got into the Cold Pimp'n vehicle, which was not the car in which Fouse had arrived. Fouse got into the left rear of the vehicle; a Hispanic male got into the right rear; a white male who was carrying an object that Balentine believed was a shotgun or rifle got into the right front; and the car, which was driven by Silva, left the residence. On one occasion, Balentine saw Fouse driving the Cold Pimp'n vehicle.

Early on the morning of August 15, the date of the Renteria incident, Agent Vieira was surveilling the First Street residence in Hilmar when, at 2:11 a.m., he saw the Cold Pimp'n vehicle drive up and park. A male dressed in dark clothing exited the driver's side of the vehicle and walked toward the front door of the residence. A minute later, a male wearing a gray shirt exited the residence and walked toward the front driver's door of the Cold Pimp'n car. He pulled what appeared to be a heavy black bag out of the right rear passenger side of the vehicle and carried it into the house. At approximately 2:14 a.m., the gold Intrepid pulled up and parked just in front of the Buick. A male, dressed all in black, exited the front passenger side door and walked up toward the front of the residence. Although Vieira could not tell if this man knocked or simply let himself in, he entered the residence. He returned to the gold Intrepid about a minute later and drove away. Another male came out of the residence and drove off in the Cold Pimp'n vehicle. Vieira could not tell whether this was either of the two men who previously had interacted with the Cold Pimp'n car. The vehicle left at approximately 2:15 a.m.

At approximately 9:50 p.m. on August 15, Balentine and one of the surveillance teams were southbound on 99 when Balentine saw Silva driving the white Eclipse convertible southbound into Merced. Morrison and Martinez were passengers in the vehicle. The three attended a party in Merced. At approximately 11:55 p.m., SDEA Agent Hoek and other officers were conducting surveillance at a residence in the southern Merced area when they saw the white Eclipse convertible leave. Silva was driving and had two passengers. The car went to the Davis Court residence in Delhi. Two people got out. The vehicle, now containing only the driver, left after about two minutes.

At approximately 8:53 p.m. on August 18, Modesto Police Sergeant Van Diemen of the SDEA drove by the home at 733 South Orange, Turlock, and saw Martinez and Morrison in the front yard. He was aware the two were cousins.

At 11:59 p.m. on August 25, SDEA Agent Tovar was surveilling the Woodglen address in Modesto. As he drove by the residence, he saw Silva and Morrison standing in the driveway, talking to each other.

As a result of the surveillance, information was developed that caused Campbell and Hoek to obtain authorization for and initiate wiretap surveillance with respect to (209) 505-9835, for which Patricia Ramos was the subscriber but which

Morrison used, and (209) 614-7098, for which Silva was the subscriber. Wiretapping was conducted from August 29 until September 10, with surveillance teams concentrating on the hours of 6:00 p.m. to 6:00 a.m. During a number of the intercepted conversations, the males referred to each other by a racially derogatory term or shortened variation thereof. Fouse became a target of the investigation when her name came up in the wiretaps.

At 6:46 p.m. on September 1, a conversation between Silva and Morrison was intercepted in which a reference was made to Silva having "that black bag" on him because his "old lady" wanted it and was supposed to show somebody in Turlock. Later in the conversation, Silva said they could just "get in the tinted windows" and "do [their] thing."

Later that evening, at 8:45 p.m., the Cold Pimp'n vehicle was followed to a Taco Bell in Turlock. At 8:48 p.m., a conversation between Silva and his mother, Terry Silva, was intercepted. There was a reference to Silva and Fouse being together at a Taco Bell, and Fouse mentioned that Silva's girlfriend was her roommate. During the course of the conversation, Terry Silva said that someone had told her there had been a lot of things in the paper about home invasions. Silva replied that there had been, which was why he had stopped for a while. Terry Silva then told him that she wanted him to take anything he had out of her house and put it in his cars or something.

At 2:47 p.m. on September 2, a conversation between Silva and Morrison was intercepted. Morrison said that he wanted to pick up the jewelry and take it, because someone wanted to check it out. About half an hour later, the gold Intrepid was seen arriving at the Woodglen residence. Approximately two minutes later, the white Mitsubishi Eclipse arrived. At 5:17 p.m., Agent Pettit, who was conducting aerial surveillance, saw the gold Intrepid meet up with a burgundy-colored car on Carlos Court. Pettit followed the Intrepid to Atlantic Street, where it met someone out front. A short time later, Pettit saw a male take a black bag out of the trunk. At 6:30 p.m., Pettit observed a male in a white shirt at the trunk of the Intrepid. Two minutes later, the Intrepid left with a green Dodge Neon. Both vehicles went to Sam's Food Lot on Carver, and someone from the Dodge got out and talked to the driver of the Intrepid.

At 6:41 p.m., a conversation in which Morrison contacted Martinez was intercepted. In it, Morrison said he needed money to make a car payment, and so gave "Mike" a good deal. Morrison spoke of how much he received per gram, and said he gave "Mike" a lot of rings and things that weighed about 10 to 15 grams apiece. When Martinez asked whether "Mike" paid 650 for what Morrison gave him, Morrison responded affirmatively and said he got two for Martinez, two for Silva (to whom he referred by a nickname), and two for himself, and would get 50 the next day. Martinez said that sounded good. Immediately after, Morrison telephoned Silva, informed him of the deal, and said that if Silva wanted $200, to come to Turlock and get it. Silva said he would. Morrison also informed Silva that he had instructed "Mike" to say they only sold stuff to him one time. At approximately 7:00 p.m., Pettit saw the Intrepid go to an apartment complex in the 500 block of Angelus Street in Turlock, where it remained for about 10 minutes.

Surveillance of the Woodglen residence showed Morrison and Martinez leaving in a green truck at 2:50 a.m. on September 3. Martinez was driving. At 9:46 p.m. that night, a conversation was intercepted in which Morrison told Martinez that he had sold some pieces of jewelry for "three," and that, if Martinez wanted $100, he should come and get it.

At 3:34 p.m. on September 8, a conversation between Silva and Morrison was intercepted in which Silva said he was trying to get some stuff moved because he had to be out of his location by 6:00 the next morning. Silva said he was trying to find a storage facility, but that "they" called him earlier and had some people who wanted to look at the jewelry. When Morrison asked whether Silva's "old lady" or Shady told

Silva that, Silva replied that it was his "old lady." [13] Morrison asked whether Silva wanted him to go over there. When Silva said yes, Morrison said he was already on his way and had everything with him. In another conversation at 10:19 that night, Martinez and Morrison discussed the price per gram, and that if "they" only wanted a few small items, then the cost would be "half price the tags."

At 10:32 p.m. on September 9, a conversation between Silva and Morrison was intercepted in which Morrison informed Silva that he and "Anthony" wanted to "do some money making." Morrison asked if Silva wanted to go out with them. When Silva said he did not want to go out and "window shop," Morrison again asked if he wanted to go. Silva responded, "Geared up?" Morrison answered affirmatively, and Silva agreed. Morrison said they were getting on the freeway in Merced, then were going to stop by Morrison's house and then go to Anthony's. He said he would call Silva when they got to Modesto. A few minutes later, at 10:36 p.m., Silva telephoned Fouse and said he might need a driver that night. He said he had called her because "David" had called him. Fouse asked whether David had sold all the gold; Silva responded that he did not think "they" sold it all, but "they" sold some of it the day before. Silva and Fouse then discussed when Silva would be there, and Fouse asked whether it was the same as last time, dropping him off and then coming back and getting him. He answered affirmatively and said she would not be used for anything else, as far as going with them. Fouse said she was moving slowly right then, but she could drive.[14] She said it would be kind of fun, and that she needed something interesting in her life right then. When she asked what car she would be driving, Silva said he would find out and see if they needed a driver, and would call her back. Silva then telephoned Morrison and asked if they were going to need a driver. When Morrison said yes, Silva said he would get Shady. Discussion then turned to what car they were going to use. Morrison responded that his mother had his Intrepid, his Thunderbird was "all primered up," and they would not all fit in Anthony's truck. Silva agreed and said his "nightmare" was full of his belongings, but that he could unload it at his house. They then discussed where they would meet. It was agreed they would meet at Silva's home, and that Morrison would grab his things and get ready at Anthony's, and then he and Anthony would go to Hilmar. Silva called Fouse back at 10:47 p.m. and told her they would need a driver. Two minutes later, there was a conversation between Morrison and Silva in which Morrison asked whether Silva had "the Moss" at his house. When Silva said he had both of them right there, Morrison said he wanted to use "the big one with the belt."

At 11:33 that night, a conversation between Silva and Fouse was intercepted in which Fouse said she saw "all them cops" and asked where Silva was. When Silva said the police were at a particular store, Fouse said now that they knew where all the police were, they should "do something" in Turlock "really fast." When she asked if Silva was at home, he replied that he was on Lander, not far from "you guys." Agent Pettit, who was conducting aerial surveillance, saw the Mitsubishi arrive at the First Street residence at 11:37 p.m. At 11:40 p.m., the Cold Pimp'n Buick arrived. At 11:48 p.m., the officer surveilling the residence on First Street, which was a short distance west of Lander Avenue, saw a female and a male standing by the Cold Pimp'n vehicle. The man was dressed in black. At 11:58 p.m., a telephone conversation was intercepted in which Silva asked Morrison where he was. Morrison replied that they were already dressed and leaving Anthony's house. Silva said he had to unpack his car.

Surveillance on Martinez's new residence on Carpenter Road in Modesto

---

[13]Silva and Fouse had been friends for approximately 15 years. Fouse had been known by the nickname "Shady" since childhood.

[14]Fouse related that she had undergone a medical procedure that day.

showed that the green Dodge pickup was parked out front at around 11:30 p.m. Martinez and Morrison took items from the residence to the vehicle at least twice, then they left in the truck just prior to midnight. Both were dressed in dark clothing, and it appeared they had placed something dark, like a duffel bag, in the cab of the truck. Agent Pettit began aerial surveillance of the vehicle at approximately 12:06 a.m., and followed it to the First Street residence in Hilmar.

At 12:04 a.m. on September 10, Vieira saw the female back the Cold Pimp'n Buick, which was parked on the street, into the driveway, underneath the carport. At 1:05 a.m., a female and a male dressed in black got into the car. The female got into the driver's side front door, and the male got into the passenger side front door. Because the vehicle was in the carport, it could not be determined whether anyone got in through the rear passenger doors. The vehicle then left the location. This was sometime after the green pickup arrived.

From the First Street residence, the vehicle went to an AM/PM store in Turlock, where a female got out and appeared to put gas in the car. The tinting on the vehicle's windows made it difficult for the surveilling [sic] officer to see inside the back.

The car was followed from the Turlock area to an area out in the country near Snelling, where it was parked, with its lights off, in an orchard across the street from a residence from 1:34 a.m. to approximately 2:27 a.m. It then left and was followed to the Hughson area.

At 3:15 a.m., Agent Pettit, who was conducting aerial surveillance, observed the Buick driving down Swanson "blacked out," i.e., with its lights turned off. It pulled into an orchard in the vicinity of a residence. Because of the trees, Pettit was unable to see whether anyone got out. Officer Myers saw the vehicle at the Swanson Road location at 3:50 a.m. The car was on the east side of the roadway, facing north, and was 10 to 15 feet off of the pavement. No exterior or interior lights were on, and the area was quite dark. Myers drove southbound on Swanson. As he passed the car, he activated his high beams. It appeared there was nobody in the front seat. He was unable to see in the back.

The Buick began moving again at approximately 4:30 a.m. Myers fell in behind the car as it headed westbound. At approximately 4:38 a.m., he became aware of a panic alarm from a home in the area in which the Buick had been parked. A pursuit of the Buick ensued.[15]

At 4:52 a.m. on September 10, a telephone conversation between Silva and his girlfriend, Virginia "Ginger" Ellsworth, was intercepted. In it, Silva revealed that he was running from the police and was hiding on Orange, in Turlock. When Ellsworth offered to come and get him, Silva told her that he was in the backyard of his "homeboy" Anthony's house at Angelus and Orange, but that the police were all around. Silva stated that he had shot at them and asked her to hurry. At 5:26 a.m., another conversation between Silva and Ellsworth was intercepted, with Ellsworth confirming that Silva was in Anthony's backyard and telling him that the house was surrounded and the area blocked off, and she could not get to him. When she told Silva not to move and to cover himself up, he replied that he did not have anything to cover himself with, but was hiding behind the Blazer in the driveway between

---

[15]There was never a plan to allow a residential robbery to occur in order to catch the perpetrators red-handed. Sergeant Van Diemen, who was acting in a supervisory capacity this evening, was aware both times the Cold Pimp'n car pulled into [fn. contd.] an orchard. He did not call for an arrest either time, however, because the information he personally had received over the radio was that when the vehicle left the Hilmar residence and headed toward Snelling, only two people-a male and a female-were observed getting into the vehicle. This indicated to Van Diemen that the full crew was not in the car, and so he did not believe that a residential robbery was going to be occurring at that point. It was his belief that the two individuals in the car were conducting scouting missions and looking for potential victim locations. It was the panic alarm call from the Garza residence that triggered the arrest.

Anthony's and the neighbor's houses. When Ellsworth asked if Silva had a gun on him, he replied no, that he had thrown it, but did not know where. The information on Silva's hiding place was passed from the monitor in the wire room to officers on the scene.

On September 10, search warrants were executed at the residences associated with the male defendants. M.J. and Jane Doe Two, Vicki and Kenneth Myers, Adriana F.G. and Z.M., and William Gibbs subsequently identified a number of items found at the Davis Court residence and in the gold Intrepid in the driveway as belonging to them.

F.G. and Z.M., Steve Christy, and M.J. identified items found at the Carpenter Road residence in Modesto as belonging to them. In addition to some of the stolen property, Martinez's room contained nine-millimeter, .38-caliber, and .357-caliber ammunition; shotgun shells; knives; and a camouflage mask type of head covering, similar to what a hunter would wear. Stolen property was also found in the other bedroom, along with a black ski cap.

At the First Street residence, officers found Christy's Browning shotgun, as well as other items belonging to him, M.J. and Jane Doe Two, the Bakers, the Myerses, Cozine and Frye, F.G. and Z.M., the Gibbses, and Jane Doe One. Also found were a sawed-off Mossberg shotgun with pistol grips; scanners tuned to Stanislaus County Sheriff's Department frequencies; the main section of the Modesto Bee, dated August 16, 2003, which contained an article about residential robberies and referred in detail to the Renteria robbery; a red suitcase containing jewelry; gun cases and holsters; a can of pepper spray; a black magazine containing 34 rounds of nine-millimeter ammunition; a black nylon hood cap with no visible eye or mouth holes; ammunition of various calibers; a pair of black gloves; six bandannas, two of which were folded in a triangular shape with two of the corners tied in the back; and a pair of black pants, a black shirt, black shoes, and black socks in a pile on the floor of the bedroom in which paperwork bearing Silva's name was found. Also found in the house were approximately 20 large-style black plastic zip ties in a clear bag.

(Lod. Doc. 4 at 2-27.)

## DISCUSSION

### I.     Jurisdiction

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that she suffered violations of her rights as guaranteed by the United States Constitution.  Petitioner is currently incarcerated at Valley State Prison for Women in Chowchilla, California.  The city of Chowchilla falls within the territorial boundaries of Madera County.  Petitioner's custody arose from a conviction in the Stanislaus County Superior Court.  As this judicial district encompasses both Madera and Stanislaus County, 28 U.S.C. § 84(b), the Court has jurisdiction over Petitioner's application for writ of habeas corpus.  *See* 28 U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district

1  court where the petitioner is currently in custody or the district court in which a state court convicted

2  and sentenced the petitioner if the state "contains two or more Federal judicial districts").

3  **II.**    **AEDPA Standard of Review**

4         On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of

5  1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

6  enactment. *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499

7  (9th Cir. 1997).  The instant petition was filed after the enactment of AEDPA and is consequently

8  governed by its provisions.  *See Lockyer v. Andrade*, 538 U.S. 63, 70 (2003).  Thus, the petition

9  "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was

10 'contrary to, or involved an unreasonable application of, clearly established Federal law, as

11 determined by the Supreme Court of the United States.'"  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir.

12 2007) (quoting 28 U.S.C. § 2254(d)(1))*, overruled in part on other grounds*, *Hayward v. Marshall*,

13 603 F.3d 546, 555 (9th Cir. 2010) (en banc); *see Lockyer*, 538 U.S. at 70-71.

14        Title 28 of the United States Code, section 2254 remains the exclusive vehicle for

15 Petitioner's habeas petition as Petitioner is in the custody of the California Department of

16 Corrections and Rehabilitation pursuant to a state court judgment.  *See Sass v. California Board of*

17 *Prison Terms*, 461 F.3d 1123, 1126-27 (9th Cir. 2006) *overruled in part on other grounds*, *Hayward*,

18 603 F.3d at 555.  As a threshold matter, this Court must "first decide what constitutes 'clearly

19 established Federal law, as determined by the Supreme Court of the United States.'"  *Lockyer*, 538

20 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal

21 law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's]

22 decisions as of the time of the relevant state-court decision."  *Id*. (quoting *Williams v. Taylor*, 529

23 U.S. at 412).  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing

24 legal principle or principles set forth by the Supreme Court at the time the state court renders its

25 decision."  *Id*.  Finally, this Court must consider whether the state court's decision was "contrary to,

26 or involved an unreasonable application of, clearly established Federal law."  *Id*. at 72 (quoting 28

27 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if

28 the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

1   of law or if the state court decides a case differently than [the] Court has on a set of materially

2   indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Lockyer*, 538 U.S. at 72. "Under the

3   'unreasonable application clause,' a federal habeas court may grant the writ if the state court

4   identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

5   that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  "[A] federal court may

6   not issue the writ simply because the court concludes in its independent judgment that the relevant

7   state court decision applied clearly established federal law erroneously or incorrectly. Rather, that

8   application must also be unreasonable." *Id*. at 411.  A federal habeas court making the "unreasonable

9   application" inquiry should ask whether the State court's application of clearly established federal

10  law was "objectively unreasonable." *Id*. at 409.

11       Petitioner bears the burden of establishing that the state court's decision is contrary to or

12  involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*,

13  94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth

14  Circuit precedent remains relevant persuasive authority in determining whether a state court decision

15  is objectively unreasonable. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While *only* the

16  Supreme Court's precedents are binding on the Arizona court, and only those precedents need be

17  reasonably applied, we may look for guidance to circuit precedents"); *Duhaime v. Ducharme*, 200

18  F.3d 597, 600-01 (9th Cir. 1999) ("because of the 1996 AEDPA amendments, it can no longer

19  reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on

20  a federal Constitutional issue....This does not mean that Ninth Circuit caselaw is never relevant to a

21  habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining

22  whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and

23  also may help us determine what law is 'clearly established'").  Furthermore, the AEDPA requires

24  that the Court give considerable deference to state court decisions.  The state court's factual findings

25  are presumed correct.  28 U.S.C. § 2254(e)(1).  A federal habeas court is bound by a state's

26  interpretation of its own laws.  *Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002).

27  \\\

28  \\\

1    The initial step in applying AEDPA's standards is to "identify the state court decision that is

2    appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more

3    than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last

4    reasoned decision. *Id*. (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) for the presumption that

5    later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same

6    ground as the prior order).  Thus, a federal habeas court looks through ambiguous or unexplained

7    state court decisions to the last reasoned decision to determine whether that decision was contrary to

8    or an unreasonable application of clearly established federal law.  *Bailey v. Rae*, 339 F.3d 1107,

9    1112-13 (9th Cir. 2003).  While both the California Court of Appeal and the California Supreme

10   Court reached the merits of Petitioner's claims, the California Supreme Court's decision consisted of

11   a summary denial.  Thus, the Court looks through that decision to the last reasoned decision, namely,

12   the decision by the California Court of Appeal. *See Nunnemaker*, 501 U.S. at 804.

13   **III.    Review of Petitioner's Claims**

14   The petition for writ of habeas corpus contains eight grounds for relief.  In her first ground

15   for relief, Petitioner contends that her constitutional rights were violated by  insufficient evidence to

16   support her conviction for attempted murder of Sergeant Allen.  The second ground for relief asserts

17   that the disclosure of gang allegations tainted the jury panel and the trial court's refusal to discharge

18   the jury panel violated Petitioner's constitutional right to a fair and impartial jury and due process of

19   the law.  In her third ground for relief, Petitioner contends that the trial court's denial of Petitioner's

20   motion to sever the trial violated her right to due process of the law.  The fourth ground for relief

21   alleges that the trial court's denial of her motion to dismiss a juror for cause during jury deliberations

22   violated her rights under the Fifth, Sixth, and Fourteenth Amendments.  In her fifth ground for relief,

23   Petitioner alleges that her Confrontation Clause rights were violated by her absence at the hearing

24   pertaining to alleged jury tampering.  The sixth and seventh grounds for relief both challenge the trial

25   court's issuance of jury instructions relating to the natural and probable cause doctrine.  In her last

26   ground for relief, Petitioner contends that cumulative error resulted from the above errors.

27   \\\

28   \\\

### A.      Ground One: Sufficiency of the Evidence

Petitioner contends that there was insufficient evidence to support her conviction for attempted murder of Sergeant Allen.  Petitioner was convicted on the charge of attempted murder pursuant to a theory of accomplice liability, stemming from the actions of co-defendant Silva.  On direct appeal, Petitioner argued that since "Sergeant Allen was outside the vehicle which Deputy Nuno was driving at the time of the shooting and because the driver's side of the windshield and door post were hit by a single bullet, the evidence that Sergeant Allen was within a zone of risk was insufficient."  (Lod. Doc. 3 at 17.)

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia*, 443 U.S. 307, 314 (1979) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)).  "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (noting that under AEDPA, a petition for habeas corpus may only be granted where the state court's application of *Jackson* was objectively unreasonable).  Thus,  a state prisoner is only entitled to habeas relief on this ground where no rational trier of fact could have found proof beyond a reasonable doubt based on the evidence adduced at trial.  *Jackson*, 443 U.S. at 324; *see McDaniel v. Brown*, 130 S. Ct. 665, 666 (2010) (per curiam).

Pursuant to the Supreme Court's holding in *Jackson*, the test to determine whether a factual finding is fairly supported by the record is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see Lewis v. Jeffers*, 497 U.S. 764, 781 (1990); *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) (per curiam) (quoting *Jackson*, 443 U.S. at 319) (stating "*Jackson* cautions reviewing courts to consider the evidence 'in the light most favorable to the prosecution'").  Where the record supports conflicting inferences, a federal habeas court "must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*,

443 U.S. at 326.  Additionally, a jury's credibility determination is "entitled to near-total deference

under *Jackson*," *Bruce*, 376 F.3d at 957, as assessing the credibility of witnesses is generally beyond

the scope of a *Jackson* review, *Schlup v. Delo*, 513 U.S. 289, 330 (1995).  Lastly, a federal habeas

court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1);

*Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).  This presumption of correctness applies to a state

appellate court's determinations of fact as well as those of a state trial court.  *Tinsley v. Borg*, 895

F.2d 520, 525 (9th Cir. 1990).  Although the presumption of correctness does not apply to a state

court's determinations of legal questions or to mixed questions of law and fact, a state court's factual

findings underlying its conclusions on mixed issues are accorded a presumption of correctness.

*Lambert v. Blodgett*, 393 F.3d 943, 976 (9th Cir. 2004); *see also Sumner v. Mata*, 455 U.S. 591, 597

(1982) (per curiam) (holding that the questions of fact that underlie mixed questions are governed by

the presumption contained in 28 U.S.C. § 2254).

Sufficiency of evidence claims are judged by "the substantive elements of the criminal

offense as defined by state law."  *Jackson*, 443 U.S. at 324 n.16.  The California Court of Appeal

summarized the applicable law on attempted murder, stating:

"Murder is the unlawful killing of a human being ... with malice aforethought." (§ 187, subd. (a).) "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623.) " '[I]ntent is inherently difficult to prove by direct evidence. Therefore, the act itself together with its surrounding circumstances must generally form the basis from which the intent of the actor may legitimately be inferred." [Citation.]' [Citation.]" (*People v. Smith* (1998) 64 Cal. App. 4th 1458, 1469 .)

The doctrine of transferred intent does not apply to the crime of attempted murder. (*People v. Bland* (2002) 28 Cal.4th 313, 317 ( *Bland* ).) "A person who intends to kill only one is guilty of the attempted (or completed) murder of that one but not also of the attempted murder of others the person did not intend to kill." (*Ibid*.) Thus, in order to be convicted of two counts of attempted murder, each involving a different victim, the prosecution must prove the perpetrator acted with the specific intent to kill each victim. (*See People v. Smith* (2005) 37 Cal.4th 733, 736, 739.) "The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Bland*, *supra*, 28 Cal.4th at p. 328.)

A person who shoots at a group of people may nevertheless be found guilty of the attempted murder of everyone in the group, even if he or she primarily targeted only one of them, if the person also, concurrently, intended to kill others within what has been termed the " 'kill zone.' " (*Bland*, *supra*, 28 Cal.4th at p. 329.) " 'The intent is concurrent ... when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the

primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' " (*Id.* at pp. 329-330; *see People v. Vang* (2001) 87 Cal.App.4th 554, 563-564.)

This does not mean that an attempted murder is committed as to all persons in a group simply because a gunshot is fired indiscriminately at them, or that a defendant may be found guilty of the attempted murder of someone he or she did not intend to kill merely because the victim was in some undefined zone of danger. (*People v. Anzalone* (2006) 141 Cal.App.4th 380, 392-393.) Rather, "to be found guilty of attempted murder, the defendant must either have intended to kill a particular individual or individuals or the nature of his attack must be such that it is reasonable to infer that the defendant intended to kill everyone in a particular location as the means to some other end, e.g., killing some particular person." ( *Id.* at p. 393.)

"The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill....' [Citation.]" (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.) This is especially true where the individual aims a loaded firearm at people he or she knows to be armed law enforcement officers, and then takes matters a step further by firing at them from a distance of 15 to 20 feet-near point blank range. (*See People v. Lee* (1987) 43 Cal.3d 666, 679 .)

(Lod. Doc. 4 at 75-77.)

The Court must accept the state appellate court's interpretation of state law regarding the requisite elements of attempted murder.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) (stating that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"); *see also Musladin v. Lamarque*, 555 F.3d 830, 838 n.6 (9th Cir. 2009) (finding that habeas court must presume that state courts know and follow the law and that state-court decisions be given the benefit of the doubt under AEDPA deferential standards).  The California Court of Appeal proceeded to find that, pursuant to California's kill zone, Petitioner's conviction for the attempted murder of Sergeant Allen did not violate Petitioner's constitutional rights under *Jackson* as there was sufficient evidence

1   in the form of Sergeant Allen's testimony, Officer Nuno's testimony, and the video tape of the

2   pursuit.

3          The state court's decision does not constitute an objectively unreasonable application of the

4   *Jackson* standard.  Officer Nuno testified that Sergeant Allen had not cleared the car door yet when

5   several shots were fired in the direction of their vehcile.  (RT at 3453-54.)  Sergeant Allen testified

6   that he heard gunfire coming from the direction of the suspect's vehicle towards his direction.  (RT

7   at 4617.)  Sergeant Allen's testimony supported Officer Nuno's statement that Sergeant Allen had

8   not yet cleared the vehicle when the shots were fired at the vehicle.  Sergeant Allen testified that he

9   was standing behind the door of the police vehicle when the shots were fired.  (Id.)  The Court does

10  not find it objectively unreasonable for the appellate court to have concluded that the testimony of

11  Officer Nuno and Sergeant Allen along with the video tape constitutes sufficient evidence of co-

12  defendant Silva's concurrent intent to kill both police officers.  Thus, the Court finds that the

13  appellate court's conclusion, that there was sufficient evidence to support Petitioner's conviction for

14  attempted murder, was not an objectively unreasonable application of *Jackson*; thus, Petitioner is not

15  entitled to habeas corpus relief.

16          ***B.     Ground Two: Jury Panel Bias***

17          Petitioner's second ground for relief alleges that she was deprived of her constitutional rights

18  to due process of the law and an impartial jury by the trial court's denial of defendants' motion

19  challenging the jury panel.  All defendants joined in a motion to quash the jury panel, arguing that

20  the panel was tainted by questionnaires that the court had directed prospective jurors to fill out.

21  Among the questions included in the questionnaire were several questions relating to gang activity,

22  specifically asking the prospective jurors whether they had strong attitudes regarding gang violence,

23  whether they had seen signs of gang activity in their community, and whether they believed certain

24  ethnic or racial groups were more likely to be gang members.

25          The Fourteenth Amendment of the United States Constitution safeguards a criminal

26  defendant's Sixth Amendment right to be tried by a panel of impartial and indifferent jurors.  *See*

27  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Green v. White*, 232 F.3d 671, 676 (9th Cir. 2000);

28  *United States v, Sarkisian*, 197 F.3d 966, 981 (9th Cir. 1999) (quoting *Irvin*, 366 U.S. at 722) ( "The

Sixth Amendment right to a jury trial 'guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors.'")  "It is not required, however, that the jurors be totally ignorant of the facts and issues involved." *Irwin,* 366 U.S. at 722-23 (finding that mere existence of preconceived notion of guilt or innocence of accused is insufficient by itself to rebut the presumption that a prospective juror is impartial).  Rather, due process requires that a defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *see also United States v. Plache*, 913 F.2d 1375, 1377-78 (9th Cir. 1990).  Jurors are objectionable if they have formed such strong and deep impressions that their minds are closed against conflicting testimony.  *See Irvin*, 366 U.S. at 722 n. 3.  The presence of even one biased juror deprives a defendant of his/her right to an impartial jury. *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc).

Courts have analyzed juror bias under theories of actual bias and implied/presumed bias, which may individually support challenging a prospective juror for cause.  *Fields v. Brown*, 503 F.3d 755, 766 (9th Cir. 2007) (en banc).  The Ninth Circuit has defined "actual bias as, in essence, bias in fact-the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Gonzales*, 214 F.3d 1109, 1112 (9th Cir. 2000) (quoted in *Fields*, 503 F.3d at 767).  A trial judge's conclusion, after a hearing, that a juror does or does not harbor "actual bias" is a finding of fact to which the presumption of correctness applies.  *Dyer*, 151 F.3d at 973; *Greene v. Georgia*, 519 U.S. 145, 146 (1996) (per curiam) (citing *Wainwright v. Witt*, 469 U.S. 412, 426-30 (1985)) (finding that a federal habeas court "must accord a presumption of correctness to state courts' findings of juror bias.").  "'In extraordinary cases, courts may presume bias based upon the circumstances.'" *Gonzalez*, 214 F.3d at 1112 (quoting *Dyer*, 151 F.3d at 981).  The Ninth Circuit has explained the distinction between actual and implied bias, stating that:

> Unlike the inquiry for actual bias, in which we examine the juror's answers on voir dire for evidence that she was in fact partial, the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced. Accordingly, we have held that prejudice is to be presumed where the relationship between the prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.

*Gonzalez*, 214 F.3d at 1112 (citations and internal quotes omitted).  Implied bias may be found

1   despite a juror's denial of any partiality.  *United States v. Torres*, 128 F.3d 38, 45 (9th Cir. 1997)

2   ("[I]n determining whether a prospective juror is impliedly biased, 'his statements upon voir dire

3   [about his ability to be impartial] are totally irrelevant.'").  Implied bias is bias conclusively

4   presumed as a matter of law.  *United States v. Wood*, 299 U.S. 123, 133 (1936); *United States v.*

5   *Greer*, 285 F.3d 158, 171 (2d Cir. 2000) (citing *Torres*, 128 F.3d at 45).  On collateral review, a

6   petitioner alleging juror misconduct must show that the alleged error "'had substantial and injurious

7   effect or influence in determining the jury's verdict.'" *Jeffries v. Blodgett*, 5 F.3d 1180, 1190 (9th

8   Cir. 1993) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

9          Here, the California Court of Appeal found that there was no support in the record for

10  Petitioner's claim that the jury panel had been tainted.  The state appellate court conducted an

11  exhaustive examination of the juror's responses to the questionnaires for possible bias.  (Lod. Doc. 6

12  at 62-64.)  Those jurors that expressed a strong attitude regarding gang violence also answered that

13  this attitude would not affect their ability to be fair and impartial jurors.  (Id. at 62.)  The voir dire

14  responses of the jurors indicated that they would reach a decision based solely on the evidence rather

15  than any fears or prejudice; thereby indicating a lack of actual bias.  (Id. at 61, n.27-63.)

16  Additionally, the appellate court noted that:

17          The gang issue simply did not permeate the trial. The court instructed the trial jurors
        and alternates, immediately before opening statements, that they "must determine the
18      facts from the evidence received in the trial and not from my [ sic ] other source" and
        that the fact a defendant had been charged with a crime was not evidence of guilt.
19      When evidence was presented, jurors were informed to which count(s) it pertained,
        and the court read the charges to them. In so doing, it did not read the gang
20      enhancement allegations. No evidence pertaining to gangs or gang activity was
        presented at trial, with the exception that, when Martinez's attorney, Mr. Rozelle,
21      asked M.J. whether there was any kind of talk that to him sounded ethnic, M.J.
        replied, "It sound-it sounded like-like gang talk." At the conclusion of evidence, the
22      trial court instructed jurors, inter alia, that the instructions previously given continued
        to apply, and that they must decide all questions of fact in the case from the evidence
23      received in the trial and not from any other source. Jurors were further instructed that
        evidence consisted "of the testimony of witnesses, writings, material objects or
24      anything presented to the senses and *offered to prove the existence or nonexistence of*
        *a fact*."
25
    (Id. at 65-66.)
26
    \\\
27
    \\\
28

1    Petitioner has not presented any evidence to rebut the presumption of correctness attached to

2    the appellate court's finding that there was no jury bias.  The Court does not find that the state

3    court's decision, that Petitioner's constitutional right to an impartial jury was not violated by the trial

4    court's refusal to discharge the jury panel, to be an objectively unreasonable application of Supreme

5    Court precedents.  Consequently, the Court finds that Petitioner is not entitled to habeas corpus relief

6    on this ground.

7    **C.    *Grounds Three*: *Severance***

8    Petitioner contends that the trial court's refusal to sever the trial violated her constitutional

9    right to a fair trial.  On direct appeal, Petitioner argued that severance was necessary since co-

10   defendant Silva would testify on Petitioner's behalf at her separate trial but not at their joint trial.

11   Additionally, Petitioner argues that severance was appropriate as she was only facing charges related

12   to one of the twelve robberies.  Consequently, Petitioner contended that she would be prejudiced by

13   having to stand trial with co-defendants as evidence relating to the other eleven robberies, in addition

14   to the sexual assaults and gang activity, would be admitted.  (Lod. Doc. 3 at 49-50.)

15   A court may grant habeas relief based on the state court's denial of a motion for severance

16   only if the joint trial was so prejudicial that it denied the petitioner his right to a fair trial.  *See Zafiro*

17   *v. United States*, 506 U.S. 534, 538-39 (1993) (court must decide if "there is a serious risk that a

18   joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from

19   making a reliable judgment about guilt or innocence"); *United States v. Lane*, 474 U.S. 438, 446 n.8

20   (1986) ("misjoinder would rise to the level of a constitutional violation only if it results in prejudice

21   so great as to deny a defendant his Fifth Amendment right to a fair trial"); *Featherstone v. Estelle*,

22   948 F.2d 1497, 1503 (9th Cir. 1991) (same).  To prevail on a habeas claim based on a trial court's

23   refusal to sever the petitioner's trial from his co-defendant, petitioner "bears the burden of

24   demonstrating that the state court's denial of his severance motion rendered his trial fundamentally

25   unfair," *see Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997), and must establish that prejudice

26   arising from the failure to sever was so "clear, manifest, and undue" that he was denied a fair trial,

27   *see Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir. 1999) (quoting *United States v.*

28   *Throckmorton*, 87 F.3d 1069, 1071-72 (9th Cir. 1996)).   A trial is rendered fundamentally unfair "if

1  the impermissible joinder had a substantial and injurious effect or influence in determining the jury's

2  verdict." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

3       On habeas review, federal courts neither depend "on the state law governing severance in

4  state trials" nor "consider procedural rights afforded in federal trials." *Grisby*, 130 F.3d at 370

5  (citing *Hollins v. Dep't of Corrections, State of Iowa*, 969 F.2d 606, 608 (8th Cir. 1992)).  Instead,

6  the relevant question is whether the state court's decision not to sever the trial violated Petitioner's

7  due process rights.  *Id.*; *see Featherstone*, 948 F.2d at 1503 ("simultaneous trial of more than one

8  offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due

9  process before relief pursuant to 28 U.S.C. § 2254 would be appropriate") (internal quotation marks

10  and citation omitted).  There is a preference for joint trials of defendants who are indicted together,

11  unless mutually antagonistic or irreconcilable defenses may be so prejudicial as to mandate

12  severance.  *See Zafiro*, 506 U.S. at 538.  Severance should be granted only if there is a "serious risk

13  that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury

14  from making a reliable judgment about guilt or innocence."  *Id.* at 539.  Here, there is no allegation

15  that co-defendants had mutually antagonistic defenses that were irreconcilable with the core of

16  Petitioner's own defense such that "acceptance of the co defendant's theory by the jury precludes

17  acquittal of the defendant."[16] *Throckmorton*, 87 F.3d at 1072; *see also Cooper v. McGrath*, 314

18  F.Supp.2d 967, 983 (N.D. Cal. 2004).

19       Petitioner's assertion that evidence relating to the other eleven robberies, sexual assaults, and

20  gang enhancements would prevent the jury from reaching a reliable determination was rejected by

21  the California Court of Appeal.  (Lod. Doc. 4 at 48-49.)  The appellate court observed that, "the

22  counts and allegations that potentially could inflame a jury against Fouse were sufficiently distinct

23  (and distinguishable) from the charges against her as to render the likelihood of prejudice minimal."

24  (Id. at 52.)  The Court of Appeal concluded that "given the strength of the case against Fouse and the

25

26  _____

27  [16]The Ninth Circuit in *Collins v. Runnels*,__F.3d___, 2010 WL 1780870, * 5 (9th Cir. 2010) recently clarified that for AEDPA purposes, "neither *Zafiro v. United States* nor *United States v. Lane* establish a constitutional standard binding on the states requiring severance in cases where defendants present mutually antagonistic defenses."  Thus, even if the

28  defenses were antagonistic, Petitioner would not be entitled to habeas corpus relief as denial of a severance in that case would not violate clearly established Supreme Court precedents.

distinct nature of the incidents from which the various charges arose, there was little or no likelihood jurors would convict her because of her association with codefendants of disreputable character." (Id.).  Additionally, the state appellate court noted that while Petitioner "presented something beyond her own bald assertion that a codefendant would give exonerating testimony on her behalf in a separate trial . . . since the joint trial did not render that trial fundamentally unfair as to Fouse, the failure to grant severance did not deprive her of a fair trial or due process." (Id. at 55.)

The Court does not find the state court's decision to be objectively unreasonable.  The denial of a severance did not result in a substantial and injurious effect on the verdict as the evidence against Petitioner on the robbery and attempted murder charges was overwhelming.  At trial, Officer Nuno testified that Petitioner was the driver of the vehicle during the exchange of gunfire between Petitioner's co-defendant and the officers.  (RT at 3443-50, 3457-70.)  Additional evidence, in the form of the transcript of a wiretapped conversation, between Petitioner and co-defendant Silva, established that Petitioner was the driver for the vehicle during the final robbery.  (CT at 406-409.)  Petitioner's knowledge that she was being asked to participate in the robberies is evidenced by her query regarding whether the gold jewelry had been sold and her desire for assurance that she would not be asked to do anything other than drive since "they'd probably be able to tackle me and shoot me." (Id. at 407-408.)  In light of such evidence, the Court finds it reasonable for the appellate court to have concluded that impermissible joinder did not have a substantial and injurious effect or influence on the jury's verdict against Petitioner.  Consequently, the Court does not find that Petitioner is entitled to habeas corpus relief on this ground.

### D.      Ground Four: Denial of Motion to Dismiss Juror

Petitioner contends that her Sixth and Fourteenth Amendment rights to a fair trial were violated by the trial court's failure to excuse jurors for cause during jury deliberations.  The California Court of Appeal summarized the factual background for this claim, stating:

> Jury deliberations began on March 24, 2006. On April 3, the sixth day of actual deliberations, court convened outside of the presence of the jury and the defendants. The court ordered the transcript of the proceedings to remain sealed pending further court order, and asked counsel not to discuss the matter with anyone until the court and counsel had discussed it further. The court then advised counsel that Juror No. 10 had informed the bailiff that she had found a black zip tie in her mailbox that morning, and that, as she was waiting to be brought in, she discussed it

with the other jurors. The bailiff had advised the court that the jurors did not feel they could continue to deliberate that day, but instead wanted to go home and be with their families. The court proposed questioning Juror No. 10 and the foreperson, then deciding with counsel what to do next.

Juror No. 10 was then brought into the courtroom and related that her house was equipped with a mailbox and place to put the newspaper. Both were located outside the house's electric gate. As she was driving through her gate onto the street about 8:30 that morning, on her way to court, she saw a black zip tie hanging out of the newspaper box. It was between 12 and 15 inches long, zipped in a loop, and similar in type to the heavy-duty ones she had been seeing in court. She knew it had not been there the day before and did not think it was something someone would do as a prank, because she did not think her son or his friends knew about the zip ties. When asked how it had affected her, Juror No. 10 explained that it shook her up, because to her, it was like a message. That was her first thought. She admitted telling the other jurors about it in the jury deliberation room, and suggested that one of the other jurors needed to tell the court about a situation that had happened earlier.

After assuring Juror No. 10 that juror information was confidential, the court observed that she looked like she was shaken up, and asked how this event had affected her ability to sit as a juror in this case. Juror No. 10 responded, "Well, I have to say today is very awkward. You know, it's just kind of mind-boggling right now, because I think, you know, the shock of it all I think too. I'm a very honest person, and I don't think that sways me in any way. I mean, I don't feel like because of that it's going to make me change my mind or make me feel any different than how we're going about it right now and being objective and being honest with what's going on and with everything." She did agree with the court's assessment that the day would not be a very productive one for deliberations, at least for her. When asked her "take" on how other jurors felt, she said they were "pretty much shook up too," and that they all felt it was "kind of hard to go into that today."

Counsel were permitted to question the juror. When Spokes noted the juror had indicated she thought it could be a message and asked whether she had formed an opinion as to whom the message may have been from, Juror No. 10 responded, "I just feel like someone who's friends with the defendants, somebody that just-I don't know." When asked if she had thought it could be a friend of the victims, the juror responded that she did not look at it that way. Spokes informed her, and the prosecutor confirmed, that the jury questionnaire did not bear the juror's address, and that the defendants did not get to look at any of the questionnaires. He asked whether the juror ever suspected she was being followed; she responded no, and that she used a post office box number, not her street address, on everything.

The trial court directed Juror No. 10 not to discuss the questions she had been asked with the other jurors, then had Juror No. 8 brought in. She related an incident about which she had not thought until Juror No. 10 said what had happened to her. When she got home from court on Thursday and pulled into her driveway, a car stopped in the middle of the road. In it were two Hispanic males, ages 25 to 29, with dark hair and fair skin. The car was dark blue. When her son asked if he could help them, one of them said they were looking for a particular street. When her son said he did not know where it was, they left. There was no street by that name in the neighborhood. Juror No. 8 did not recognize them and had not seen them sitting inside the courtroom. She would have thought nothing of what happened absent the new information, and her learning the new information from Juror No. 10 would not affect her ability to serve as a juror in this case. Juror No. 8 believed the day would be a productive day of deliberations for her personally, but could not speak for others.

Juror No. 12, the foreperson, was then brought in. When asked how the information disclosed by Juror No. 10 would affect Juror No. 12's ability to deliberate in this case, she responded that it did not affect her personally. She stated, "I find it alarming, and I find it very frightening, but it doesn't change the direction I'm

headed." She subsequently clarified that her emotions "[a]bsolutely" would not cause her to be less than fair and impartial, and that part of her emotion had been feeling badly that Juror No. 10 was so upset. She agreed with the court's statement that nobody knew who did it; when Spokes interjected that they certainly knew the defendants did not do it, Juror No. 12 responded, "We know that too." The prosecutor pointed out, and the court confirmed, that the press had reported zip ties being found at numerous residences involved in the case. When asked whether it would be a productive day to deliberate, Juror No. 12 related that Juror No. 10 had been very upset by the time she reached the deliberation room, and that she told the other jurors before they even got behind closed doors. As soon as they were let in, they immediately told the bailiff. They did not deliberate after finding out the information, as Juror No. 10 was obviously shaken and, while not crying, was tearful. They also did not sit around and try to say who was responsible or how the zip tie got there, although they obviously knew nobody in the courtroom did it. Everybody was a little shocked, but Juror No. 12 personally felt more settled than when she first heard the news, as people had been just sitting there, chitchatting. Juror No. 12 felt that the rest of the jurors would probably be okay to continue, but that it should be Juror No. 10's decision, because she was the most nervous about it. Aside from Juror No. 10 being upset, Juror No. 12 did not notice anyone having a particularly adverse reaction to the news.

The jurors were given the day off and asked to return the next day.[17] They were ordered not to discuss the matter with anyone else or to have further discussions among themselves.

The next day, the court allowed counsel to suggest areas of inquiry, and it then questioned each juror individually.[18] Juror No. 10 was first. The court stated its understanding that she had contacted the bailiff the day before about additional zip ties being found at her home. Juror No. 10 related that her husband had, and that the Turlock Police Department had responded. She did not think finding the zip ties would have any additional impact on her, because she believed they may have come from a basketball hoop her son had installed the prior September.[19] The juror agreed with the court's statement that there was no evidence or information as to the source of the first zip tie. When asked about her initial reaction that the defendants may have somehow been responsible, Juror No. 10 stated, "I have done a lot of thinking and stuff, and I don't know to be honest. I don't know. That's still in the back of my mind, you know, that it might be a statement. I don't know from someone." She agreed that she did not know who it might be, and that it could have been anyone. The court reminded her that the defendants were in jail, which had been known since jury selection, and that her juror information was not public. It then noted that she had been upset the day before, and asked whether that had changed in the last 24 hours. She said yes, that she felt better, and that she thought it was just the initial shock of everything-wondering what it was and whether it meant something, or whether somebody had followed her home. When the court asked whether the incident would affect her ability to serve as a juror, she replied that she did not think so, and that she believed she would be able to set it aside and make her decision in the case based solely from the evidence she had heard in the trial. When pressed, she clarified that she would not favor either side, and that it would not influence her. Although it scared her, she would not speculate as to the source in terms of letting it enter into her

---

[17] Juror No. 10 was informed, outside the presence of the other jurors, that an investigator would collect the zip tie.

[18] During the course of this questioning, the court informed all of the jurors, except, inadvertently, Juror Nos. 2 and 3, that all juror information was confidential.

[19] She did not share the information about the additional zip ties with the other jurors.

deliberations.

Juror No. 1 was next. She admitted speculating about the source of the zip tie, and being very scared. She stated: "I took it as a warning like, oh, you know, we know where you live." The court reminded Juror No. 1, who, it stated for the record, cried when responding about people possibly knowing her address, that all juror information was confidential, and that her address had not been disclosed and was not on the jury questionnaire. Juror No. 1 responded that she understood that; she also agreed with the court's statement that there was no evidence as to the source of the zip tie. She stated that, although she had a hard time thinking it was random or a coincidence, she also thought it could have come from a victim's family, as there were some unhappy victims, or the defendants probably had some family members in court who could have followed one of the jurors. Juror No. 1 stated that she could see both sides, and that it scared her to think that someone possibly followed a juror home. When asked whether she could make her decision in the case based solely on the evidence she had heard in the trial and ignoring the zip tie, she stated she thought she could and had all along. She stated that she thought she had kept an open mind and been able just to look at the evidence, but she admitted that she was scared and a little nervous. She believed she could look at the evidence, because she did not know who did it and never would. Being scared would not affect how she decided. When asked whether her reaction had changed in the last 24 hours, she said no, that she was still nervous, and was more aware when she went home. When asked again whether her deliberations would be affected by the information in any way, she responded, "No, I don't think it would be affected. I don't know who did it. It could have been a victim. It could have been a friend of a defendant. It could have been a victim, friend of a victim, so I cannot sit here and say yes, it was the defendants' family or friends that did it. I don't feel that way. I just feel that it was a sick thing to do, and it just makes me nervous. I feel like I'm in a movie, The Juror. I don't know."[20] When asked if she felt she could continue to deliberate, the juror stated, "As long as nothing else happens like this, because I feel like if I find a zip tie, I will not go on. [¶] ... [¶] "[T]his in itself I don't feel like I have a problem going on, but I do feel like it is in my mind, and I don't think I'm going to-I've gone this far keeping an open mind, looking at the evidence. This does not-it's not going to make me go, okay, I'm going to sway one way or the other. I haven't been doing that the whole time. This is not going to make me do it, but am I nervous for my family that something stupid might happen? Yes. By who? I don't know. So I'm-I don't know. That's just how I feel. I don't know if I'm contradicting myself, but I don't know."

Next, the court questioned Juror No. 2. This juror felt badly for Juror No. 10, because she was visibly upset, but "it did nothing for [Juror No. 2] one way or the other." Juror No. 2, who would have had no problem deliberating the day before, did

---

[20]In conjunction with his appeal in case No. F052296, Silva has requested that we take judicial notice of this film, a copy of which he has lodged as an exhibit. Although Fouse has not expressly joined in the motion, she has joined in Silva's argument concerning the underlying issue. Accordingly, we will assume she also joins in the motion.

Pursuant to Evidence Code section 452, subdivision (h), we take judicial notice of the existence of the film The Juror (Columbia Pictures 1996). We decline, however, to notice its contents. (*Fremont Indem. Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113; *People v. Manson* (1976) 61 Cal.App.3d 102, 163; *see Weitzenkorn v. Lesser* (1953) 40 Cal.2d 778, 787-788.) We are not being asked to take judicial notice of, for instance, the existence of certain statements or dialogue in the film (*cf. Keimer v. Buena Vista Books, Inc.* (1999) 75 Cal.App.4th 1220, 1224-1225 & fn. 4); *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1397-1398) or even of a mere plot synopsis. Instead, we are being asked to judicially notice the film "in order to give context to the juror's expressions of her feelings, and to evaluate the trial court's ruling on the motion to excuse the juror for cause." This is not a proper subject for judicial notice. (*Fremont Indem. Co. v. Fremont General Corp., supra*, 148 Cal.App.4th at p. 113, *see Keimer v. Buena Vista Books, Inc., supra*, 75 Cal.App.4th at p. 1224, fn. 4.)

not speculate concerning who might be responsible for the zip tie, "because it could be any number of things." Learning the information would not cause Juror No. 2 to favor or be against either side, and the juror would be able to make a decision solely based on the evidence.

Upon hearing what happened, Juror No. 3 was worried for Juror No. 10, but not for him-or herself. When asked about speculating as to who might have been responsible, the juror replied, "I think we all did to a certain extent. I know that I thought about it, but what good is that going to do? You can sit there and speculate all day long, and it's still your speculation. There's no hard evidence to point to any one particular person so why do that?" Juror No. 3 did not speculate as to one side, because it could have been someone who knew Juror No. 10 was on jury duty, a friend of her son who was trying to do something silly, an associate of a defendant or Juror No. 10's children, or anybody-not necessarily somebody intending harm. Juror No. 3 would "[a]bsolutely" be able to refrain from speculating as to who might have been responsible. As far as any change in reaction, initially Juror No. 10 was frightened, so Juror No. 3 was concerned for her. Now that Juror No. 10 was calm and fine, Juror No. 3 was fine. Juror No. 3's concern was for Juror No. 10's emotional well-being, not for what could potentially happen. What happened was "unrelated to the trial in [Juror No. 3's] mind." It would not affect deliberations.

Juror No. 4 felt badly for Juror No. 10. At most, the information might have impacted Juror No. 4 a little bit, but the juror was aware there was no evidence about the source, and Juror No. 4 did not want to blame the defendants or victims or anyone for doing this. Juror No. 4 would be able to make a decision solely based on the evidence, and would not speculate as to how the zip tie got in the mailbox.

Juror No. 5 related that, when he arrived the day before, Juror No. 10 was upset. He asked what was wrong, and she said she had found a black zip tie in her newspaper box. He was concerned about her because she was very upset. Although he found it odd, it did not cause him personal concern. He did not speculate about who might be responsible, and had no thoughts about that. As far as affecting his deliberations, he planned to continue as he had "been going so far." It would not affect his deliberations in any way, and he would not favor either side as a result of learning the information.

Juror No. 6 related being told the information by Juror No. 10 while waiting in the hallway for the door to be opened. Juror No. 10 was tearing up and looked scared. Everyone was surprised. Juror No. 6 was stunned and scared for Juror No. 10. Juror No. 6's reaction had not changed in 24 hours-it was still a feeling of concern, but not fear. As to who was responsible, Juror No. 6 probably speculated a little bit and thought it was someone one of the defendants knew. Juror No. 6 had no knowledge of who did it, but thought it had something to do with the case-not that the defendants had a part in it, but that it was somebody who was concerned about them. Neither her speculation nor the information received from Juror No. 10 would enter Juror No. 6's deliberations or be held against either side.

Juror No. 7 related being in the hallway when Juror No. 10 entered, looking upset. When the other jurors asked what was wrong, she told them. They tried to console her and discussed whether it could be coincidental. They thought it probably was not. Juror No. 7 personally was shocked and upset, as she wondered who put the zip tie there and how they knew where Juror No. 10 lived. She was no longer as upset as she had been; she thought more possibly it was a coincidence and might not be related to the case. She initially thought that if someone did put it there on purpose, it might be a friend of the defendants. Juror No. 7 would be able not to speculate about the source in deliberating and to base her decision solely on the evidence.

Juror No. 8 heard the information in the hallway, felt badly for Juror No. 10 because she was scared, and gave her a hug. Juror No. 8 personally did not feel afraid or speculate as to who might have done it, as anyone could have been responsible. Juror No. 8 would disregard the information and make a decision based solely on the

evidence.

Juror No. 9's reaction, upon hearing the information, was mostly one of disbelief. Although who might have done this crossed his mind and he thought perhaps it might be a friend of someone, he had no idea. He felt nervous, but less so after 24 hours. He understood no one knew who put the zip tie there, and he could stop speculating and not let it enter his deliberations. As far as he was concerned, this would not be any different than any other information the court told jurors to disregard, and he thought jurors thus far had been doing a very good job of sticking to the facts they had been given.

Juror No. 11 related that she learned about the zip tie inside the jury room, when Juror No. 10 stated it to all of them. Some may have found out before that. Although it did not change the way she viewed the evidence and how she felt about everything, she was definitely frightened. She did not have any children, but her husband came home late and left early, and she was a little afraid to be by herself. Nevertheless, she would be fair; she definitely did not feel the defendants did this. She did not think it was possible for them to do it, although the situation "definitely jumped [her] nerves." She did not speculate who might have done it; she had no idea, and it seemed a little coincidental. When asked whether she would be able not to speculate, Juror No. 11, who began tearing up as she was answering, said she was not really sure. She explained that her parents lived a few blocks from Juror No. 10, and she sometimes left court and went straight there. She assumed, since no one knew juror information, they could possibly have been followed. She did not know by whom, but it made her nervous. Her reaction had not changed in the last 24 hours; she was still "just kind of afraid." She stated, "I don't feel my decisions are any different. It could have nothing to do with this. I'm just a little bit afraid." When asked whether she would be able to disregard the information in terms of her deliberations, she responded, "Yes, it really doesn't affect-it's just my own personal safety that it affected, but it doesn't affect it at all. I've separated the two. I know that sounds really confusing." Juror No. 11 reiterated that the information she received from Juror No. 10 would not have any impact on her decisionmaking process in this case and would not affect her deliberations in any way. When asked specifically about whether the fear she was feeling would affect her deliberations, Juror No. 11 said no, that it would just affect her when she was going home and coming back. She did not feel in fear being in court.

Juror No. 12 was the next person questioned. She related that when she heard the information from Juror No. 10, her reaction was one of surprise, as she had never heard of black zip ties before this trial. It bothered her that Juror No. 10 was upset and tearful. The reaction Juror No. 12 felt upon hearing this and seeing Juror No. 10 was upset lessened over time, as she was rational enough to think that she did not need to be that concerned about it. She was not afraid at all for her personal safety, and did not speculate as to who might have been responsible. It was obviously not one of the defendants, and it never would have occurred to her to think it was. She did not know Juror No. 10 personally and did not know anything about her home. Juror No. 12 left court the day before feeling totally normal and had a normal evening and night. Her reaction this day was the same; she thought they would probably just continue deliberating. When asked whether she would be able to ignore the information in her deliberations, Juror No. 12 replied, "Absolutely. I don't have a fright over that, and I haven't picked up any vibes this morning around me that anyone else does, but that's just my speculation." The information would not affect her deliberations in any way.

After concluding the questioning of the other jurors, the court had Juror No. 10 brought back into the courtroom for follow-up questions about the incident's effect on her. Juror No. 10 said that the fact the zip tie was found in her mailbox would not affect her deliberations in any way, and she would be able to set it aside just like anything else the court had instructed jurors to set aside. She did not have any doubt about that.

The defendants subsequently challenged the entire panel based on the likelihood the issue would affect jurors' decisionmaking processes in the case, and, alternatively, the responses and emotional states of Juror Nos. 1, 10, and 11, and the fact there were not enough alternate jurors to replace those three. The court denied the challenge to the entire panel, but invited counsel to address the jurors individually. After argument with respect to Juror No. 1, the trial court stated: "It's obvious that Juror Number 1 was upset. She was tearing and used Kleenex during the questioning, but I will note that she was probably the most tearful of all the jurors throughout the trial.... I have noticed her tearing during various testimony throughout this trial, so I'm not going to place a lot of credence in that. She's obviously upset, but she did state that the information that she had she seemed to have equal potential blame for either the victims and/or the defendants, indicated it could be either side, and that she would not be swayed, and based on her statements to the Court, I will deny the challenge to Juror Number 1. I find her statements to be credible."

There were no challenges to Juror Nos. 2 through 9. After argument with respect to Juror No. 10, the trial court ruled: "It's obvious to me that Juror 10 was visibly upset yesterday. I think she has been among the most stoic of the jurors throughout the trial, pretty much expressionless throughout the trial. I did notice what appeared to me her being upset yesterday.... She did request that we not deliberate yesterday because she was still upset .[¶] She certainly looked more like her normal self today when she came back, indicated herself that she was feeling better today, and she is of the opinion that the zip ties could have been anyone. Within the realm of possibilities could include, I suppose, the defendants, could include the victims, a message that maybe this is taking too long, could have just been chance. [¶] And she did state that ... this would not influence her decision, and she indicated that she would be true to herself and would not speculate as to the source of this, and I find that her statements-she appeared to be credible to me and did express her true feelings. And even yesterday said, I have to be completely honest, and I believe that she was, so the challenge the Juror Number 10 is denied ."

Counsel then argued with respect to Juror No. 11. The court stated: "As I recall she stated that she does not feel that the defendants were responsible for this. [¶] ... [¶] And not in fear being here. And, frankly, I think listening to this trial we probably are a little bit more cautious about things that could happen to us. And, frankly, I did not notice whether she cried during the trial or not.... [¶] ... [¶] She did today, but during the trial. I don't know if that's an unusual situation for her or not.... [¶] But early into the questioning today she pretty much volunteered on her own that this would not change her deliberation, and based on that I will deny the challenge of Juror Number 11."

There was no formal challenge to Juror No. 12. Nevertheless, the court stated: "She indicated as of today she was not afraid, and, frankly, I think that we all had a very similar reaction when we found out the news about what had happened, and we're all human, including the jurors, and I don't think that there's a substantial likelihood that they would be influenced by this. And what I will do before the jury starts deliberating once again, I'm going to give them an admonition...."

After the lunch recess, the jurors were returned to the courtroom. The court admonished them not to speculate as to the cause of the zip tie being found in Juror No. 10's mailbox, to disregard it completely, not to allow it to enter into their deliberations in any way, and to pretend it never happened. They then resumed deliberations, and continued to deliberate for all of April 5, 6, 7, and 10. On April 11, they returned their verdicts.

(Lod. Doc. 4 at 88-99.)

As previously noted, the Sixth Amendment of the United States Constitution guarantees a

criminal defendant the right to a fair trial by a panel of impartial jurors. *See Irwin*, 366 U.S. at 722;

*see also Dyer*, 151 F.3d at 973. This constitutional mandate also requires the jury verdict be based

entirely on the evidence produced at trial. *Turner v. Louisiana*, 379 U.S. 466, 472-473 (1965).

When presented with allegations of jury misconduct or juror bias, the trial court is required to

determine what transpired, the impact on the jurors, and whether or not what transpired was

prejudicial. *Remmer v. United States*, 347 U.S. 227, 229-230 (1954); *Dyer*, 151 F.3d at 974 ("A

court confronted with a colorable claim of juror bias must undertake an investigation of the relevant

facts and circumstances."). As the Supreme Court noted:

> [T]ampering directly or indirectly, with a juror during a trial about the matter pending
> before the jury is, for obvious reasons, deemed presumptively prejudicial . . . The
> presumption is not conclusive, but the burden rests heavily upon the Government to
> establish, after notice to and hearing of the defendant, that such contact with the juror
> was harmless to the defendant.

*Remmer*, 347 U.S. at 229 (citing *Mattox v. United States*, 146 U.S. 140, 148-150 (1892)).

Here, the California Court of Appeal first concluded that there was no inherent prejudice

resulted from this incident, stating:

> Objectively considering what took place in light of the record in this case, we
> conclude the finding of the zip tie by Juror No. 10, and her dissemination of that
> information to other jurors and their discussion of it, were not inherently and
> substantially likely to bias any juror. (*See People v. Danks*, [(2004) 32 Cal.4th 269,]
> 305.) Jurors were forcefully and directly admonished not to speculate as to the source
> of the zip tie and to disregard it completely, and we see no reason to find inapplicable
> " '[t]he crucial assumption underlying our constitutional system of trial by jury,' " to
> wit, that jurors follow instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139; *cf.*
> *People v. Holloway* (1990) 50 Cal.3d 1098, 1111-1112 [conclusion that presumption
> of prejudice unrebutted might have been different had misconduct been revealed in
> time for trial court to take corrective steps such as admonition], disapproved on other
> grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) This is especially
> true where, as here, no actual threat was made (*see Harris*, [(2008) 43 Cal.4th 1269,]
> 1300-1306 [death threat against juror's father, originally believed to be related to case,
> not too inherently prejudicial to be disregarded] ); the communication-assuming it
> was a communication-was ambiguous (cf. *Jeffries v. Wood* (9th Cir.1997) 114 F.3d
> 1484, 1488, 1490-1492 [where one juror informed others of defendant's prior criminal
> record, communication by its nature was intrinsically prejudicial; factors suggesting
> potential prejudice was diminished in particular case so that verdict was not affected
> include (1) whether prejudicial statement was ambiguously phrased; (2) whether
> extraneous information was otherwise admissible or merely cumulative of trial
> evidence; (3) whether curative instruction was given or other ameliorative steps were
> taken; (4) the trial context; and (5) whether statement was insufficiently prejudicial
> given issues and evidence in case] ), and jurors did not return guilty verdicts soon
> after learning of events, but instead continued to deliberate for several more days (*see*
> *People v. Manriquez* (1976) 59 Cal.App.3d 426, 429-431 [juror in robbery trial
> became victim of attempted armed robbery just prior to deliberations, then told other

jurors; trial court did not learn of incident until deliberations were underway, at which time it questioned jurors about ability to decide case strictly on evidence presented].) Moreover, their verdicts demonstrate that they carefully and methodically worked through the issues before them.

(Lod. Doc. 4 at 110-111.)

The Court of Appeal then proceeded to examine whether there was evidence of actual bias stemming from this incident. The appellate court found that:

the receipt of the information was totally inadvertent, both on the part of Juror No. 10 and the jurors she then told. To the extent Juror No. 10 or other jurors disobeyed any admonitions, we find it significant that they simply had a very human reaction to a startling event and upset fellow juror. There was no deliberate misconduct or willful failure to follow instructions. (*Compare People v. Holloway* (2004) 33 Cal.4th 96, 125 [failure to discharge juror not abuse of discretion, and no substantial likelihood juror biased, where discussion of case with alternate juror was not deliberate disobedience to admonitions] with *People v. Ledesma, supra*, 39 Cal.4th at p. 743 [juror admitted discussing case with wife in violation of admonition, an act of deliberate misconduct; juror's serious and willful misconduct is good cause to believe juror will not be able to perform duty]; *People v. Daniels, supra*, 52 Cal.3d at pp. 863-864 [same; juror repeatedly violated court's instructions].) It was not discussed during deliberations; in fact, Juror No. 12 was very clear that jurors neither deliberated after finding out the information nor discussed how the zip tie came to be in Juror No. 10's newspaper box or who was responsible. Moreover, it was not information directly concerning the defendants per se, and each juror ultimately realized the ambiguity of what occurred. (*Compare People v. Danks, supra*, 32 Cal.4th at p. 308 [juror's misconduct in sharing Bible passages with fellow jurors demonstrated neither substantial likelihood of her actual bias nor likelihood it resulted in actual bias of other jurors, where juror did not repeatedly refer to extrajudicial information or attempt to impose her views on others] *with People v. Nesler*, [(1997) 16 Cal.4th 561,] 583-585, 587, 588-589 (lead opn. of George, C.J.) [juror intentionally interjected extraneous information, directly concerning defendant and substantially related to important matters raised during trial, into deliberations, suggesting substantial likelihood of actual bias on her part].) Although some jurors were still upset, fearful, or at least nervous 24 hours later, a juror's safety concerns or even fear of a defendant do not necessarily suggest bias. (*See People v. Jablonski* (2006) 37 Cal.4th 774, 807; *People v. Navarette* (2003) 30 Cal.4th 458, 499-500.) What matters is whether the individual can separate feelings and emotions from his or her duties as a juror, and evaluate the evidence fairly and decide the case solely on the evidence presented at trial. (*See People v. Farnam*, [(2002) 28 Cal.4th 107,]139-142.)

(Id. at 112-113.)

The appellate court ultimately concluded that the trial court's inquiry into the issue was "more than adequate." (Id. at 43.) The Court finds the state court's decision to be an objectively reasonable application of Supreme Court precedents. The trial court in this case conducted the hearing required by *Remmer* with all counsel present and participating. The trial court examined the jurors's answers and their demeanor for potential prejudice stemming from the jury tampering and in

1    assessing the juror's ability to render an impartial decision on the evidence.  Thus, the appellate

2    court's finding, that Petitioner's constitutional rights were not offended when the trial court denied

3    Petitioner's motion to excuse certain jurors during deliberations, was not an objectively unreasonable

4    application of Supreme Court precedents and Petitioner is not entitled to habeas corpus relief.

5        **E.    *Ground Five: Absence from Juror Misconduct Hearing***

6        The trial court excluded all defendants from participating in the hearing regarding the

7    possible jury tampering.  Petitioner contends that the trial court's exclusion of the criminal

8    defendants at the hearing violated her constitutional rights.

9        A criminal defendant has a constitutional right to be present at every stage of his/her trial.

10   *Illinois v. Allen*, 397 U.S. 337, 338 (1970).  The United States Supreme Court has observed that:

11        The constitutional right to presence is rooted to a large extent in the Confrontation
         Clause of the Sixth Amendment, *e.g., Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057,
12        25 L.Ed.2d 353 (1970), but we have recognized that this right is protected by the Due
         Process Clause in some situations where the defendant is not actually confronting
13        witnesses or evidence against him. In *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct.
         330, 78 L.Ed. 674 (1934), the Court explained that a defendant has a due process right
14        to be present at a proceeding "whenever his presence has a relation, reasonably
         substantial, to the fulness of his opportunity to defend against the charge.... [T]he
15        presence of a defendant is a condition of due process to the extent that a fair and just
         hearing would be thwarted by his absence, and to that extent only." *Id*., at 105-106,
16        108, 54 S.Ct., at 332, 333; *see also Faretta v. California*, 422 U.S. 806, 819, n. 15, 95
         S.Ct. 2525, 2533, n. 15, 45 L.Ed.2d 562 (1975). The Court also cautioned in *Snyder*
17        that the exclusion of a defendant from a trial proceeding should be considered in light
         of the whole record. 291 U.S., at 115, 54 S.Ct., at 335.

18
     *United States v. Gagnon*, 47 U.S. 522, 526-527 (1985); *see also United States v. Mitchell*, 502 F.2d
19
     931, 972 (9th Cir. 2007).
20

21       The California Court of Appeal found that Petitioner had failed to establish that her absence

22   from the proceeding prejudiced her case or denied her a fair trial, noting that "[t]his was not a

23   hearing at which evidence was presented concerning guilt or innocence, nor was Fouse's conduct

24   directly at issue." (Lod. Doc. 4 at 101.)  Rather, the appellate court analogized the situation to an in

25   chambers proceeding and found that "given the nature of the concerns expressed by jurors, allowing

26   Fouse to be present could well have been counterproductive." (Id. at 102.)  The Court of Appeal

27   concluded that even if excluding Petitioner from the proceeding had been erroneous, the error was

28   harmless beyond a reasonable doubt under the *Chapman v. California*, 386 U.S. 18, 23 (1967),

1   standard.  (Id. at 102-103.)

2          The Court does not find the California Court of Appeal's decision to be an objectively

3   unseasonable application of Supreme Court precedents.  The appellate court identified the correct

4   legal principles governing Petitioner's claim.  As noted by the appellate court, Petitioner's conduct

5   was not directly at issue and Petitioner's defense would not have been helped by Petitioner's

6   presence at the hearing.  *See Johnson v. Cullen*, 2010 WL 1345283, * 40-41 (N.D. Cal. Apr. 6, 2010)

7   (finding state court's decision, that habeas petitioner's constitutional rights were not violated by trial

8   court's exclusion of petitioner from *in camera* proceeding to discharge juror, was not an objectively

9   unreasonable application of *Gagnon*).  Thus, Petitioner's presence was not required to address the

10  issues to be resolved at the hearing.  As the Court of Appeal reasonably noted, given the topic of the

11  hearing, namely jury tampering, the presence of any of the criminal defendants was more likely to

12  have hindered rather than helped resolve the issues at hand.  More importantly, Petitioner has not

13  established that she was prejudiced in any way by her absence at the hearing, much less that her

14  absence resulted in a substantial and injurious effect or influence in determining the jury's verdict.

15  *See Brecht*, 507 U.S. at 638.  Thus, Petitioner is not entitled to habeas corpus relief on this ground.

16              *F.      Ground Six and Seven: Instructional Error*

17          In her sixth and seventh grounds for relief, Petitioner contends that her constitutional rights

18  were violated by the trial court's issuance of jury instructions relating to the natural and probable

19  consequence doctrine.  Specifically, Petitioner contends that by failing to instruct the jury that they

20  were required to find that the attempted murders were a natural and probable consequence of the

21  target crime, Petitioner's rights under the Sixth and Fourteenth Amendment to have a jury determine

22  her guilty beyond a reasonable doubt were violated.  Additionally, Petitioner contends that her right

23  to due process of the law was violated by the natural and probable consequence doctrine instructions

24  as the instruction acted as a presumption of malice.

25          Generally, claims based on instructional error under state law are not cognizable on habeas

26  corpus review.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459

27  U.S. 422, 438 n.6 (1983)).   To obtain federal collateral relief for errors in the jury charge, a

28  petitioner must show that the error so infected the entire trial that the resulting conviction violates

1    due process.  *Estelle*, 502 U.S. at 72; *see Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting

2    *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) in finding that a habeas court must not merely

3    consider whether an "instruction is undesirable, erroneous, or even universally condemned" but must

4    instead determine "'whether the ailing instruction by itself so infected the entire trial that the

5    resulting conviction violates due process'").  An erroneous jury instruction "directed toward an

6    element of the offense may rise to the level of a constitutional defect."  *Byrd*, 566 F.3d at 862 (citing

7    *Neder v. United States*, 527 U.S. 1, 9-10 (1999)).  "Due process requires that jury instructions in

8    criminal trials give effect to the prosecutor's burden of proving every element of the crime charged

9    beyond a reasonable doubt. [Citation] 'Nonetheless, not every ambiguity, inconsistency, or

10   deficiency in a jury instruction rises to the level of a due process violation.'"  *Townsend v. Knowles*,

11   562 F.3d 1200, 1209 (9th Cir. 2009) (quoting *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per

12   curiam)).   Additionally, "[t]he jury instruction may not be judged in artificial isolation, but must be

13   considered in the context of the instructions as a whole and the trial record."  *Id.* (citation and

14   internal quotation marks omitted).  "If the charge as a whole is ambiguous, the question is whether

15   there is a reasonable likelihood that the jury has applied the challenged instruction in a way that

16   violates the Constitution."  *Middleton*, 541 U.S. at 437.

17        Petitioner first argues that the trial court's instructions did not require the jury to determine

18   whether the attempted murder was a natural and probable consequence of the robberies, thereby

19   violating Petitioner's Sixth and Fourteenth Amendment right to have a jury find her guilty beyond a

20   reasonable doubt on all essential elements of the crime.  The trial court instructed the jury on two

21   theories of liability for the attempted murder charges.  The jury was instructed with California Jury

22   Instruction-Criminal ("CALJIC") No. 6.11, which pertained to the theory of conspiracy, and CALJIC

23   No. 3.02, which pertained to aiding and abetting.   It is the issuance of CALJIC No. 3.02 which

24   Petitioner is currently challenging.  Pursuant to CALJIC No. 3.02, the jury was instructed that, "[o]ne

25   who aids and abets in the commission of a crime is not only guilty of that crime, but is also guilty of

26   any other crime committed by a principal which is a natural and probable consequence of the crime

27   originally aided and abetted."  (RT at 5246.)  The trial court further instructed the jury that in order to

28   find Petitioner guilty of attempted murder, the jury had to be satisfied beyond a reasonable doubt of

1  four elements: (1) that the crime of robbery was committed; (2) Petitioner aided and abetted that

2  crime; (3) a co-principal[21] in that crime committed the attempted murder; and (4) the crime of

3  attempted murder was a natural and probable consequence of the commission of the crime of

4  robbery.  (RT at 5247.)

5       With respect to Petitioner's first allegation, the California Court of Appeal found:

6           Turning to the merits of Fouse's argument, we are not convinced any further
        instruction was required. Although the California Supreme Court has imposed a
7        limited sua sponte duty to identify and describe for the jury the target offense(s)
        allegedly aided and abetted by the defendant when the prosecution relies on the
8        natural and probable consequences doctrine (*People v. Prettyman, supra,* 14 Cal.4th
        at p. 268), it has not required the trial court to further instruct, sua sponte, that the jury
9        must specifically determine whether the charged crimes were the natural and probable
        consequences of some other criminal act the defendant knowingly and intentionally
10       aided or encouraged (*People v. Williams* (1997) 16 Cal.4th 635, 673-674). Moreover,
        at least one court has rejected the notion that, in a prosecution for attempted
11       premeditated murder, jurors must be instructed to find that a premeditated attempted
        murder was a natural and probable consequence of the target offense, instead finding
12       it sufficient to instruct that attempted murder had to be a natural and probable
        consequence. (*People v. Cummins* (2005) 127 Cal.App.4th 667, 680-681.) In the
13       present case, jurors were separately instructed to find, as to counts 36 and 37, whether
        the victim of the attempted murder was a peace officer and the perpetrator knew or
14       reasonably should have known the victim was a peace officer engaged in the
        performance of his or her duties.

15           Even assuming jurors were required specifically to find that attempted murder
        of a peace officer was a natural and probable consequence of robbery before they
16       could convict Fouse of counts 36 and 37 as an aider and abettor, we find no error. "'It
        is well established in California that the correctness of jury instructions is to be
17       determined from the entire charge of the court, not from a consideration of parts of an
        instruction or from a particular instruction. [Citations.] "[T]he fact that the necessary
18       elements of a jury charge are to be found in two instructions rather than in one
        instruction does not, in itself, make the charge prejudicial." [Citation.] "The absence
19       of an essential element in one instruction may be supplied by another or cured in light
        of the instructions as a whole." [Citation.]' [Citation.]" (*People v. Bolin* (1998) 18
20       Cal.4th 297, 328.)

21           Here, the charges were read to the jury as part of the court's instructions. Thus,
        jurors were told that counts 36 and 37 charged the defendants with attempting to
22       murder "a peace officer engaged in the line [ sic ] of duty." CALJIC No. 6.11
        specifically required jurors to determine whether those crimes were natural and
23       probable consequences of the criminal objective of the conspiracy. The alleged
        objective of the conspiracy was robbery. Jurors were told not to single out any
24       particular sentence or individual point or instruction and ignore the others, and to
        consider the instructions as a whole and each in light of all the others. The evidence
25       provided absolutely no basis upon which jurors could have made a different finding
        under an aiding and abetting theory than they did under a conspiracy theory of

26  _____

27       [21]The instructions defined a principal as, "Persons who are involved in committing or attempting to commit a crime
    are referred to as principals in that crime.  Each principal, regardless of the extent or manner of participation, is equally guilty.
28   Principals include: ¶ Those who directly and actively commit or attempt to commit the act constituting the crime, or ¶ Two,
    those who aid and abet the commission or attempted commission of the crime."  (RT at 5245.)

1   liability. To the extent there may have been some ambiguity, the arguments of counsel
    correctly explained the relevant law. Under all the circumstances, we conclude a
2   reasonable juror would have correctly understood the governing law. (*See People v.*
    *Kelly* (1992) 1 Cal.4th 495, 525-527; *People v. Hansen* (1997) 59 Cal.App.4th 473,
3   482.)

4   (Lod. Doc. 4 at 84-85.)

5       The Court's examination of the record does not lead to the conclusion that the state court's

6   decision was objectively unreasonable.  The jury instruction did not leave out the requirement that

7   the attempted murder be a natural and probable consequence of the robbery.  Furthermore, the Court

8   is convinced that the instruction did not deprive Petitioner of a fundamentally fair trial as the jury

9   charge clearly instructed that a conviction for attempted murder required under an aider and abettor

10  theory required a jury finding that the attempted murder was a natural and probable consequence of

11  the robbery.  Consequently, the Court finds Petitioner is not entitled to habeas corpus relief on this

12  ground.

13      Petitioner's additionally challenges the jury instructions on the grounds that the natural and

14  probable cause doctrine itself violates her due process rights.  The appellate court found that this

15  particular argument been foreclosed by the California Supreme Court's decision in *People v.*

16  *Richardson*, 43 Cal. 4th 949, 1021 (2008).  (Lod. Doc. 4 at 85-86.)  Additionally, the Court of

17  Appeal rejected the argument that the jury was instructed that they could return a verdict for

18  attempted murder without finding the essential element of intent to kill.  (Id. at 87.)  The appellate

19  court noted that the jury was instructed that the perpetrator, namely the person who committed the

20  act requirement of attempted murder, had to harbor a specific intent to kill another human being but

21  that this intent was not required for an aider and abettor.  The state court found that the jury was

22  instructed that the aider and abettor "must 'act with knowledge of the criminal purpose of the

23  perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating

24  commission of, the offense . . . Once the necessary mental state is established, the aider and abettor is

25  guilty not only of the intended, or target, offense, but also of any other crime the direct perpetrator

26  actually commits that is a natural and probable consequence of the target offense."  (Id. at 87.)  The

27  Court notes that the Ninth Circuit had rejected a similar argument to the one Petitioner currently

28  raises in *Spivey v. Rocha*, 194 F.3d 971, 976-977 (9th Cir. 1999), in which a habeas petitioner

challenged the issuance of the natural consequence doctrine as applied to his second degree murder

conviction as it did not require a jury finding on malice.  The Ninth Circuit found that California's

natural and probable consequence doctrine does not violate due process.  *Id*.  Consequently, as the

trial court's instruction regarding the natural and probable consequence doctrine was a correct

statement of law, Petitioner is not entitled to habeas corpus relief on this ground.

### F.  *Ground Eight: Cumulative Error*

In her last ground for relief, Petitioner contends that the cumulative effect of the alleged

errors resulted in a fundamentally unfair trial.  "The Supreme Court has clearly established that the

combined effect of multiple trial court errors violates due process where it renders the resulting

criminal trial fundamentally unfair. [Citation]  The cumulative effect of multiple errors can violate

due process even where no single error rises to the level of a constitutional violation or would

independently warrant reversal."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing

*Chambers v. Mississippi*, 410 U.S. 284, 290 n. 3, 298, 302-303 (1973)); *see also Welchel v.*

*Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000) (noting that cumulative error applies on habeas

review).  Here, the California Court of Appeal noted that as they had "found little or no error," the

cumulative effect of these errors did not warrant reversal.  The Court agrees that Petitioner's right to

a fundamentally fair trial was not implicated by these alleged errors; therefore, the state court's

decision finding no cumulative error is not an objectively reasonable application of Supreme Court

precedent and Petitioner is not entitled to habeas corpus relief on this ground.

### RECOMMENDATION

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

Respondent.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O' Neill,

United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule

304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with the

court and serve a copy on all parties.  Such a document should be captioned "Objections to

1   Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

2   filed within ten (10) *court* days (plus three days if served by mail) after service of the objections.

3   The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The

4   parties are advised that failure to file objections within the specified time may waive the right to

5   appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

6

7   IT IS SO ORDERED.

8   **Dated:      August 23, 2010**                              **/s/ John M. Dixon**
                                                     UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28